# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

ABINGTON EMERSON CAPITAL, LLC,

    Plaintiff,

v.

Civil Action 2:17-cv-143
Judge Sarah D. Morrison
Magistrate Judge Jolson

LANDASH CORPORATION, et al.,

    Defendants.

## OPINION AND ORDER

This matter is before the Court on Plaintiff Abington Emerson Capital, LLC's ("Abington") Motion to Compel Email Communications between Susan Santo and Defendant Afif Baltagi or, in the alternative, Request for *In Camera* Inspection. (Doc. 294). As for Abington's request for *in camera* inspection, XPO withdrew its objection to this request, (Doc. 313 at 4), and submitted the documents to the Court on November 5, 2019. Abington's unopposed request for *in camera* inspection is **GRANTED**, but, for the following reasons, Abington's Motion to Compel is **DENIED**.

### I. BACKGROUND

The dispute currently before the Court is about whether Defendant XPO Logistics ("XPO") must disclose certain email communications. But context is necessary here. Previously in this litigation, the parties disagreed about whether Abington could depose XPO's former in-house counsel, Susan Santo. The Court ruled that the deposition could be convened but with "proper regard for the attorney-client or work product privileges[.]" (Doc. 255 at 8 ("This Opinion merely permits Abington to convene Ms. Santo's deposition on specific nonprivileged topics.")).

Now, Abington seeks all communications between Ms. Santo and XPO's former employee, Defendant Afif Baltagi, who managed one of XPO's warehouse facilities in Houston, Texas. (Doc. 294). XPO withheld the communications on the basis of attorney-client privilege or work product protection. (Doc. 294-1). Roughly 250 emails are at issue, and they fall into three general categories: (1) email communications and attachments between Ms. Santo and Mr. Baltagi; (2) email communications and attachments between Ms. Santo and other XPO employees with Mr. Baltagi copied; and (3) unauthorized email communications sent by Mr. Baltagi. The matter is fully briefed and ripe for review. (*See* Docs. 294, 309, 317).

## II.  STANDARD OF REVIEW

"Determining the proper scope of discovery falls within the broad discretion of the trial court." *Gruenbaum v. Werner Enter., Inc.*, 270 F.R.D. 298, 302 (S.D. Ohio 2010) (citing *Lewis v. ACB Business Servs., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998)). Under Rule 26(b) of the Federal Rules of Civil Procedure, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a)(1).

Here, because XPO asserts privilege, it bears the burden of establishing the attorney-client privilege or work product protection. *See Cooey v. Strickland*, 269 F.R.D. 643, 647–48 (S.D. Ohio 2010). And since this Court's jurisdiction is based upon diversity of citizenship, Ohio law governs the Court's analysis of the attorney-client privilege. *See* Fed. R. Evid. 501; *see also Jewell v. Holzer*, 899 F.2d 1507, 1513 (6th Cir. 1990) ("In a civil case involving claims based on state law, the existence of a privilege is to be determined in accordance with state, not federal law."). The same is true for Abington's crime-fraud exception argument. *Safety Today, Inc. v. Roy*, No. 2:12-

CV-510, 2014 WL 12750617, at *3 (S.D. Ohio May 16, 2014) ("The scope of the crime-fraud exception is a matter of state law."). But federal law governs XPO's claims of attorney work product. *Travelers Cas. & Sur. Co. v. Excess Ins. Co.*, 197 F.R.D. 601, 605 (S.D. Ohio 2000) ("As it relates to defendant's claim of work product doctrine, which is not an evidentiary privilege but a procedural tool for managing discovery, federal law governs.") (citing Fed. R. Civ. P. 26(b)(3)).

## III. ANALYSIS

As a starting point, a brief description of the general nature of the withheld documents is useful. Ms. Santo's sworn affidavit provides relevant background. In it, she swears that she "first became involved" with this matter in May 2016 after her client, XPO, received a letter from Star Funding accusing XPO's then-employee, Mr. Baltagi, of improperly releasing Star Funding's tires to Defendant Jason Adkins' company. (Doc. 309-1, ¶ 5). Ms. Santo "conducted a factual investigation" of these allegations "in order to be able to provide legal advice to [XPO]." (*Id.*). She continued her investigation "when counsel for Plaintiff contacted XPO regarding OTR tires on September 23, 2016." (*Id.*, ¶ 6). As part of her investigation, she corresponded with XPO employees, including Mr. Baltagi, and probed their knowledge of Star Funding's accusations. (*Id.*, ¶ 5).

XPO withheld these communications on the basis of the attorney-client privilege. (*See* Doc. 294-1). In addition, it has asserted that all but a handful of the documents are protected by attorney work product. (*See id.*). The Court first will address the narrower doctrine of attorney-client privilege before turning to XPO's claims of work product.

### A. Attorney-Client Privilege

3

Abington challenges XPO's assertion of privilege in three ways: (1) Mr. Baltagi was a "rogue employee," and, therefore, his communications were not made in the course and scope of his employment; (2) the communications were made for a business rather than legal purpose; and (3) the communications are discoverable under the crime-fraud exception. (*See generally* Doc. 294).

   1.   **"Rogue Employee"**

To start, Abington sets forth a "rogue employee" theory. (*Id*. at 4–6). Abington does not rely on case law to support this theory but instead depends on the following logical chain: (1) an employee's communications are privileged only if they were made in the course and scope of his or her corporate duties; (2) XPO claims that Mr. Baltagi was a "rogue employee" and, therefore, he could not have made the communications in the course and scope of his employment; (3) consequently, the emails between Ms. Santo and Mr. Baltagi were never privileged in the first instance and must be disclosed. (*Id*.; *see also* Doc. 317 at 6–7).

But there are too many breaks in the chain. To start, Abington does not provide legal support for its "course and scope" argument. Indeed, its reliance on *Graff v. Haverhill N. Coke Co.*, does not support its theory. (*See* Doc. 294 at 5 (arguing against privilege and citing No. 1:09-CV-670, 2012 WL 5495514, at *14 (S.D. Ohio Nov. 13, 2012))). Rather, *Graff* affirms the unremarkable proposition that the privilege "applies in the corporate context and extends to communications between attorneys and corporate employees . . . where the communications concern matters within the scope of the employees' corporate duties[.]" 2012 WL 4395514, at *14.

The communications here meet that standard. As discussed, the emails concern Ms. Santo's investigation following Star Funding's demand letter. And, having reviewed the

4

documents *in camera*, the Court can confirm that they "concern matters within the scope of the employees' corporate duties." *Id*. In other words, even if Mr. Baltagi was acting outside of the course and scope of his employment—which the Undersigned is not in a position to conclude—Ms. Santo was unaware of that fact, and importantly, their email correspondence still "concern[s] matters within the scope of [his] [ ] corporate duties." *Id*. Given this, Abington's "course and scope" argument falls short.

More fundamentally, the premise of Abington's "rogue employee" theory undermines a core principle of the attorney-client privilege: the privilege belongs to the client. Here, the client is XPO, and a single employee cannot waive or otherwise destroy the privilege on behalf of the corporation. Rather, "'[t]he power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors.'" *U.S. ex. rel. Fry v. The Health All. of Greater Cincinnati*, No. 1:03-CV-167, 2009 WL 5033940, at *4 (S.D. Ohio Dec. 11, 2009) (quoting *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985)); *see also Cecil v. Orthopedic Multispecialty Network, Inc.*, No. 2006 CA 0067, 2006 WL 2474349, at *7 (Ohio Ct. App. August 28, 2006) (noting the same under Ohio law). At its core, Abington's "rogue employee" theory asserts that the actions of a lone warehouse manager retroactively destroyed attorney-client privilege. But the privilege never belonged to Mr. Baltagi, and he had no authority to give it away. *See, e.g.*, *Fry*, 2009 WL 5033940, at *4 (holding that, because employee "was not a corporate officer or board member, he could not waive the privilege"). So Abington's "rogue employee" theory fails.

### 2. *Legal Purpose*

Abington next argues that the communications at issue relate primarily to business purposes and, consequently, are unprotected. (Doc. 294 at 6–7). In support, Abington relies on deposition testimony purportedly showing that XPO has attempted to cloak everyday business decisions in the guise of privilege. (*Id*.).

In the corporate context, communications between an employee and corporate counsel often involve both legal and non-legal matters. *Alomari v. Ohio Dep't of Pub. Safety*, No. 2:11-CV-00613, 2014 WL 12651191, at *3 (S.D. Ohio June 19, 2014). In such instances, the court must ask, "whether the predominant purpose of the communication [was] to render or solicit legal advice." *Id*. (quotation marks and citation omitted). Importantly, "the mere fact that business considerations are weighed in the rendering of legal advice does not vitiate the attorney-client privilege." *Id*. (quotation marks and citations omitted).

The Court has inspected the emails *in camera* and finds that the communications between Ms. Santo and Mr. Baltagi were made pursuant to Ms. Santo's factual investigation into Star Funding's and Abington's allegations of wrongdoing related to the tires. Her affidavit supports the Court's finding wherein she states that all of the withheld communications were "made in the course of [her] factual investigation into the Star Funding allegations and/or contain [her] legal advice and opinions concerning that dispute." (Doc. 309-1, ¶ 5). So, while the Court recognizes the business matters at stake, the communications' primary purpose related to Ms. Santo's investigation.

The law is clear that communications such as these are privileged. Indeed, the attorney-client privilege "extends to factual investigations conducted by an attorney at the request of the corporate client for purposes of providing legal advice to the corporate client." *William Powell Co. v. Nat'l Indem. Co.*, No. 1:14-CV-00807, 2017 WL 1326504, at *14 (S.D. Ohio Apr. 11, 2017),

*aff'd sub nom. William Powell Co. v. OneBeacon Ins. Co.*, No. 1:14-CV-807, 2017 WL 3927525 (S.D. Ohio June 21, 2017), *and modified on reconsideration*, No. 1:14-CV-00807, 2017 WL 4315059 (S.D. Ohio Sept. 26, 2017) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). Also protected is "factual information conveyed by an employee to the attorney in the course of the factual investigation" because the privilege "protects 'not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice.'" *Graff*, 2012 WL 5495514, at * (quoting *Upjohn*, 449 U.S. at 390).

In sum, having had the benefit of reviewing the communications *in camera*, the Court finds that they were part of Ms. Santo's investigation into allegations against her client. Consequently, these documents are privileged and protected from disclosure.

### 3. Crime Fraud Exception

Finally, Abington contends that Mr. Baltagi's communications with Ms. Santo must be disclosed under the crime-fraud exception to the attorney-client privilege. (Doc. 294 at 8–10). In support, it relies on Mr. Baltagi's alleged involvement in the overarching tire scheme. (Doc. 294 at 9). Therefore, so says Abington, at least some of his communications must have been made in furtherance of the scheme. (*Id.*).

"The Ohio Supreme Court has held that the attorney-client privilege does not attach to conversations with clients that relate to some future unlawful or fraudulent transaction." *Lytle v. Matthew*, 89 N.E.3d 199, 205 (Ohio 2018) (quotation marks and citation omitted). This is so because the policies of candor and confidentiality underlying the attorney-client privilege are "extinguished when a client desires to obtain legal advice . . . for purposes of planning a future wrongdoing." *Am. Mun. Power, Inc. v. Bechtel Power Corp.*, No. 2:11-CV-131, 2012 WL

7

6059357, at *2 (S.D. Ohio Dec. 6, 2012) (citing *United States v. Zolin*, 491 U.S. 554, 563–64 (1989)). The exception "assure[s] that the 'seal of secrecy' between a lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud or crime.'" *Id.* (quoting *Zolin*, 491 U.S. at 563).

Applied here, the Court must decide whether any of the communications between Ms. Santo and Mr. Baltagi "contain[] a communication which was either obtained in order to further some alleged scheme of criminal or fraudulent conduct, or was closely related to that goal." *DRFP, LLC v. Republica Bolivariana de Venezuela*, No. 2:04-CV-793, 2015 WL 5026223, at *2 (S.D. Ohio Aug. 26, 2015). If so, these communications "are not deserving of protection." *Id*. Otherwise, the attorney-client privilege applies—even if the communications were "made between perpetrators of a fraud and their attorney." *Id*. Said differently, "the crime-fraud exception is not a bludgeon which can be used to obtain, in wholesale fashion, every communication between an attorney and a client who may have committed some crime or fraud, but only those communications which might have been solicited by the client in order to further his or her illegal or fraudulent activities." *Id*.; *see also Glidden Co. v. Jandernoa*, 173 F.R.D. 459, 481–82 (W.D. Mich. 1997) ("Grow apparently assumes that a plaintiff may have full discovery of all attorney-client communications between defendants and counsel in any case where a plaintiff's fraud allegations are colorable. This is not the law.").

Importantly, the question is not whether Mr. Baltagi—or anyone else—committed fraud. Rather, the relevant inquiry is whether the communications between Ms. Santo and Mr. Baltagi were made "to facilitate or conceal the criminal or fraudulent activity." *Safety Today, Inc.*, 2013 WL 5597065, at *6. *Cf. United States v. Skeddle*, 989 F. Supp. 890, 902 (N.D. Ohio 1997)

8

(applying crime-fraud exception where defendants "contacted and consulted with" counsel "to determine whether their activities would violate the law").

Upon review of the communications, none of the correspondence feature Mr. Baltagi seeking assistance or legal advice from Ms. Santo for purposes of planning the alleged fraud. Instead, as discussed, the communications relate to Ms. Santo's steps to investigate the matter internally. So the crime-fraud exception does not apply, and disclosure is not required. *See, e.g.*, *Am. Mun. Power, Inc.*, 2012 WL 6059357, at *3 (finding that, after reviewing the emails *in camera*, it was "unnecessary to opine" on whether defendant engaged in fraud because the emails "simply were not made for the purpose of getting advice for the commission of the fraud") (quotation marks and citation omitted).

### B. Attorney Work Product

Briefly, Abington also asserts that the communications are not protected work product. It contends that the communications involve mere facts relating to the tire scheme and were not created in anticipation of litigation. (*Id*.). (Doc. 294 at 10–13). It also avers that, even if the documents are work product, it has no other means to discover the information because Mr. Baltagi has asserted his Fifth Amendment privilege and refused to testify at his deposition. (*Id*. at 13).

"Work product consists of the tangible and intangible material which reflects an attorney's efforts at investigating and preparing a case, including one's pattern of investigation, assembling of information, determination of the relevant facts, preparation of legal theories, planning of strategy, and recording of mental impressions." *In re Grand Jury Subpoena Dated Nov. 8, 1979*, 622 F.2d 933, 935 (6th Cir. 1980) (citing *Hickman v. Taylor*, 329 U.S. 495, 511, (1947)). At base, "[t]he privilege creates a zone of privacy in which an attorney can investigate, prepare, and analyze a case." *In re Grand Jury Subpoena Dated Nov. 8, 1979*, 622 F.2d at 935.

As discussed, Ms. Santo became involved with this matter after Star Funding sent XPO a demand letter accusing XPO's then-employee, Mr. Baltagi, of improperly removing Star Funding's tires from one of XPO's warehouse facilities. (Doc. 309-1, ¶ 5). She subsequently initiated a factual investigation of these allegations. (*Id.*). It is "essential" that Ms. Santo, as XPO's then-counsel, had the freedom to "assemble information, sift what [she] consider[ed] to be the relevant from the irrelevant facts, prepare [her] legal theories and plan [her] strategy . . . with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman*, 329 U.S. at 510–11; *see also Cason-Merenda v. VHS of Michigan, Inc.*, 118 F. Supp. 3d 965, 969 (E.D. Mich. 2015) (noting that each side's informal evaluation of its case should be protected). At bottom, the Court will not disturb a lawyer's ability to investigate claims lodged against her client.

Finally, with regard to Abington's argument that it has no other means to acquire the information, the Court notes that the "substantial need" exception applies only to communications withheld on the basis of work product. XPO has successfully asserted the attorney-client privilege for each of the withheld communications, *supra* 4–7, and there is no "substantial need" exception to the attorney-client privilege. Said differently, the documents at issue are not susceptible to Abington's "substantial need" argument, and the communications remain protected.

## IV. CONCLUSION

For the foregoing reasons, Abington's request for *in camera* inspection is **GRANTED**, and Abington's Motion to Compel is **DENIED**.

IT IS SO ORDERED.

Date:   November 20, 2019                    /s/ Kimberly A. Jolson
                                             KIMBERLY A. JOLSON
                                             UNITED STATES MAGISTRATE JUDGE