**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**ABINGTON EMERSON CAPITAL, LLC,**

                    Plaintiff,

   -vs-

**JASON ADKINS,** *et al.,*

                    Defendants.

Case No.: 2:17-cv-143

Judge Sarah D. Morrison

Magistrate Judge Jolson

<u>**OPINION & ORDER**</u>

Plaintiff Abington Emerson Capital, LLC loaned Defendant Jason Adkins $1.5 million to facilitate the purchase and sale of off-the-road ("OTR") mining tires in the hopes of making a high profit with a quick turnaround. Neither the tires nor the sale materialized, however. Adkins is currently awaiting sentencing for wire fraud, money laundering, and tax evasion for his role in this and other similar deals gone bad; Abington sued him and numerous others in an attempt to recoup its losses.

Defendants XPO Logistics, Inc. and XPO Global Forwarding, Inc. (collectively "XPO") are two of those defendants. XPO now moves for summary judgment, and both sides have filed numerous preliminary motions. The Court has thoroughly reviewed the record in this case and determines that oral argument is unnecessary. For the reasons set forth below, XPO's Motion for Summary Judgment is **DENIED**. (ECF Nos. 332, 338.) The remaining motions are addressed *seriatim.*

## I.     BACKGROUND

Abington is a California company that specializes in offering purchase order financing to high-risk borrowers with bad credit. (ECF Nos. 365 at 43 and 342 at 82.) XPO Logistics, Inc. is a holding company and the parent company of its wholly owned subsidiary, XPO Global Forwarding, Inc.[1] (ECF No. 338 at 8 n.2.) XPO Global is a Delaware corporation that "acts as an intermediary to coordinate the shipment of customer freight through the necessary channels, like air, ocean, trucking, rail or some combination thereof, to get it from Point A to Point B." (ECF No. 338-8 at ¶ 3.) The remaining defendants are:

| | |
|---|---|
| Jason Adkins | President and CEO of non-defendant Landash Corporation. Ohio resident. |
| Afif Baltagi | Former branch manager of XPO's Houston, Texas location. Texas resident. |
| John Eckerd[2] | Friend of Adkins. Texas resident. |
| Todd Wilkin[3] | President of Mid America Tire of Hillsboro, Inc. d/b/a Best-One Tire & Service of Hillsboro. Ohio resident. |
| Mid America Tire of Hillsboro, Inc. d/b/a Best-One Tire & Service of Hillsboro[4] | Tire seller and distributor. Ohio corporation. |

Abington secures much of its business through loan brokers. (ECF Nos. 341 at 132 and 342 at 47-48.)[5] In February 2015, a broker named Gerald Watson alerted Abington to a potential purchase-order financing deal involving OTR tires with Landash Corporation as the borrower.

---

[1] XPO Logistics, Inc. argues it is not a proper party because it is merely the parent and holding company of XPO Global Forwarding, Inc. (ECF Nos. 338 at 8 n.2 and 365 at 2 n.3.)
[2] A bankruptcy stay is in effect as to claims against Eckerd.
[3] A bankruptcy stay is in effect as to claims against Wilkin.
[4] A bankruptcy stay is in effect as to claims against Mid-America.
[5] Citations to deposition transcripts are to pages from the deposition itself.

(ECF No. 342 at 120-23 and Ex. 3.) Landash wanted to buy twenty-four OTR tires from Mid-America and re-sell them to Giant Tyres, an Australian corporation, for a profit of $528,000. (ECF No. 67 at 31-32.) The e-mail stated that Adkins was "looking at potential of up to $30 million in 80-inch tire purchases" and needed money to pay for the tires. (ECF No. 342-5.) The broker included documents purportedly showing Adkins's previous OTR sales and Adkins's unsigned 2014 net worth statement in the correspondence. (ECF No. 342-4.)

Abington had no experience in the OTR tire market and had not worked with Adkins before. (ECF No. 343 at 106.) Abington employees Omid Shokoufandeh (an analyst) and Michael Urtel (an underwriter) reviewed the documents. (ECF Nos. 342 at 125 and 343 at 58). Shokoufandeh and Urtel then spoke to Adkins and Watson. Adkins said that he was Landash's president and sole employee. (ECF No. 341-45.) Adkins wanted Abington to loan Landash $1,523,000 so Landash could buy tires from Mid-America to re-sell them to Giant Tyres at a profit. (ECF Nos. 341-45 and 342 at 244.) Adkins told Shokoufandeh that he had done business with Giant Tyres before. (ECF No. 342 at 144.)

Adkins suggested using LAD Impex Corporation as the freight forwarder and escrow agent for the deal. (ECF Nos. 343-1 at 133-34 and 341 at 244.) Abington was familiar with another freight forwarding company, C.H. Robinson Project Logistics. (ECF No. 343 at 134-139.) So, Abington asked C.H. Robinson to participate in lieu of LAD. However, C.H. Robinson declined to participate, stating that the deal made "no sense" for C.H. Robinson because it is "a freight forward[er] that makes money moving freight and not by facilitating payments to suppliers and buyers." (ECF No. 343-14.)

Adkins also suggested that the parties use XPO's Houston location as the storage facility because that was Giant Tyres's preferred warehouse. (ECF No. 265-29.) Adkins provided Abington with Baltagi's name as XPO's contact. *Id.*

Adkins had met Baltagi in 2012, when Baltagi was working for Concert Group Logistics ("Concert"). (ECF No. 265-1 at 20, 251-3.) Adkins used Concert for tire deals. *Id.* Concert became XPO Global Logistics and Adkins kept working with Baltagi at XPO. (ECF No. 265-1 at 251-3 and 349 at 52.) Baltagi was Adkins' sole contact at XPO. (ECF No. 265-1 at 24-5, 71.) As the Houston branch manager, Baltagi was responsible for client development and sales. (ECF No. 338-8 at ¶ ¶ 2, 5.) Adkins directed Baltagi when to accept and when to release tires. (ECF No. 265-1 at 71-2, 79.)

When Abington began the underwriting process, Adkins did not speak to Abington much and he did not complete a loan application. Abington did not conduct a criminal background check on Adkins. Abington did not contact any major OTR tire manufacturer to confirm that Landash was an approved buyer. (ECF No. 343 at 203.) Abington did not contact anyone on Adkins' prior sales lists to verify that those sales took place. (ECF No. 343 at 207-09.) Abington did not engage an accountant to inspect Adkins's or Landash's financial records. (ECF No. 342 at 221.)

Abington did search for UCC financing statements for Adkins' companies and court cases involving Adkins using only his first and last name. (ECF No. 343-16.) The results showed: (1) three federal tax liens totaling almost $24,000; (2) state tax liens totaling almost $15,000; (3) civil judgments totaling almost $20,000; and (4) a UCC financing statement against Landash for twelve mining tires located at XPO in Houston. (ECF No. 343-16.) Additionally, Shokoufandeh and Urtel spoke with whom they believed to be David Judd at Giant Tyres to

confirm that Giant Tyres would be buying the tires. (ECF Nos. 265-1 at 46 and No. 343 at 87-89.) Adkins coordinated the call. (ECF No. 342 at 206-7.) Urtel and Shokoufandeh also spoke to Wilkin to confirm Mid-America's intent to sell the tires to Landash. (ECF No. 342 at 351.)

Satisfied with its research, Abington issued a term sheet to Adkins, which pertinently provided that:

1. A[bington] must approve any and all warehousing providers intended to be used to receive tires from seller and securely hold tires during the buyer's inspection and diligence period.
2. A[bington] must receive and approve [an] invoice from seller prior to issuing a letter of credit or disbursing funds to seller or seller's agent.
3. A[bington] must receive confirmation that full payment from buyer is received prior to releasing tires to buyer or buyer's agent.

(ECF No. 343-15.) The term sheet indicated that funds were to be used solely to facilitate the "purchase, shipping and warehousing of OTR tires." *Id*. Abington would acquire a security interest in all of Landash's assets, and Adkins would personally guarantee the loan. *Id*. Lastly, Landash would pay Abington a $2,500 "due diligence" fee. *Id*. Adkins signed the term sheet and paid the fee.

Shortly thereafter, Shokoufanedh and Urtel traveled to Houston to meet with Adkins, Eckerd, Baltagi and Watson. (ECF Nos. 343 at 143, 186 and 265-1 at 38 and 342 at 173-75.) Shokoufandeh and Urtel believed Eckerd was Adkins's partner. (ECF No. 342 at 173-75.) Baltagi said he had worked with Adkins before and he showed Urtel some of Landash's tires that were being stored outdoors in a fenced field at the XPO facility. (ECF No. 343 at 144-45.)

After returning to the office, Urtel completed an Executive Summary ("Summary") of Landash, the OTR tire industry, and the loan's terms. The terms were that: Landash would sign a promissory note for $1,523,000, Landash would execute a blanket security interest in the tires to

Abington, Adkins would personally guarantee the loan, and repayment with a 7.25% annual interest rate would be due on or before June 2, 2015. (ECF No. 265-33 at 4.)

The Summary detailed the acquisition and resale process as follows: (1) Landash would provide Abington with a purchase order setting forth the seller name, address, quantity of tires to be purchased, tire make and model, and total purchase price; (2) Mid-America would ship the tires to XPO in Houston; (3) XPO would notify Abington in writing about receipt and condition of the tires, specifying their serial numbers; (4) Abington would record a UCC financing statement on the tires; (5) Landash would give Abington a purchase order from Giant Tyres stating the quantity, make and model of tires to be sold; and (6) Abington would wire the loan money to Landash's bank account. (ECF Nos. 342-17 and 265-33.)

Abington's loan committee, of which Urtel was one of three members, reviewed the Summary when deciding whether to approve the deal. (ECF Nos. 343-1 at 198-202 and 343-25.) The loan analysis indicated that Abington would earn $133,593.75 from the deal, which equated to a 47.9% internal rate of return. (ECF No. 341-45.) The loan committee decided to proceed with the loan, and the documents were signed on March 4, 2015. (*See* ECF Nos. 265-33, 265-34, 265-35, 265-36 and 342 at 102.)

Numerous documents were then sent to Abington. First, Adkins e-mailed Abington the Mid-America and Giant Tyres purchase orders on March 9, 2015. (ECF No. 265-37.) Each contained the required information as to the make, model and quantity of tires at issue.

Second, on March 16, 2015, Baltagi e-mailed Wilkin and Adkins a Warehouse Receipt ("Warehouse Receipt"). (ECF No. 265-43.) It appeared as follows:

WAREHOUSE RECEIPT (NON-NEGOTIABLE)

Receipt No. 208941

XPO Logistics, Inc.
4513 Oates Road
Houston, TX 77013

(832)239-5807

ww.xpogloballogistics.com

This Non-Negotiable Warehouse Receipt is to certify that XPO Global Logistics, Inc, referred to as Warehouseman, has received in storage for the account of Best One Mid America Tire of Hillsboro the following items:

| GOODS | TYPE | SIZE | WEIGHT | STORAGE RATE | HANDLING RATE |
|-------|------|------|--------|--------------|---------------|
| 24-TIRES | MICHELIN | 4000R57 | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Delivery will be made to the person designated upon order of Mid America Tire of Hillsboro. The terms of this Receipt governs the relationship between the parties to the sale of the above listed items and XPO Global Logistics and supersede any terms on any other bill of lading, delivery order, or warehouse receipt.

By: _____, XPO Global Logistics, Inc.

Date: _____ 3/ 16 _____, 2015

*Id.* Baltagi's cover e-mail stated the twenty-four Michelin 4000R57 tires had arrived and were "free of any damage[]." *Id.* A list attached to the Warehouse Receipt contained twenty-four serial numbers for the tires. *Id.* Wilkin forwarded the e-mail with attachments to Shokoufandeh. *Id.*

7

Third, that same day, Baltagi e-mailed Shokoufandeh a signed "Inspection Report" (ECF No. 265-44):

## Inspection Report

This Inspection Report is to certify that XPO Global Logistics, Inc, referred to as Inspector, has inspected certain OTR Tires delivered to our facility located at 4513 Oates Road Houston, TX 77013.

The inspection was completed on March 16, 2015 and Inspector hereby confirms the specific details of the OTR Tires delivered by Best One Tire dba Mid America Tire of Hillsboro are new in condition, have complete serial numbers and meet all industry standard requirements to be used for the intended purpose. The detail of each respective OTR Tire is detailed in Exhibit A attached hereto.

IN WITNESS WHEREOF, Inspector has caused this inspection to be signed by its proper corporate officer on this the 16th day of March, 2015.

By: _____
Printed: _C. Atif Baltagi_
Title: _BM_
Date: _3/16/15_

Exhibit A to the Inspection Report listed the quantity, manufacturer, size, model, condition and serial number for the tires. *Id.*

The fourth document, a March 16, 2015 e-mail from Baltagi to Shokoufandeh, contained a "Bill of Sale" transferring title of the tires to Abington and Landash jointly. (ECF No. 67-22.) On March 17, 2015, Baltagi e-mailed Shokoufandeh an exhibit detailing the make, model and serial numbers of the tires. Next, Adkins e-mailed Shokoufandeh a Seller Warehouse Release Letter ("Release Letter") signed by himself and Wilkin noting that Mid America sold the tires to Abington and Landash. The Release Letter directed XPO to take instructions from those entities as to the tires' transport. (ECF No. 67-23.)

Seventh, and finally, Adkins e-mailed Shokoufandeh a Warehouse Security Interest

Letter ("Security Letter") with another listing of the tires' make, model and serial numbers. (ECF

No. 265-38.) That letter was signed, although it appeared to have red-lined changes. It appeared

as follows:

### WAREHOUSE SECURITY INTEREST LETTER

March 17, 2015

XPO Global Logistics
4513 Oates Road
Houston TX 77013}

Gentlemen:

We have granted to Abington Emerson Capital, LLC ("AEC") a security interest in OTR Tires hereby listed in attached Exhibit A ("Inventory"), and all documents related thereto and the proceeds thereof, including proceeds in the form of accounts, which were acquired as a result of financing provided by AEC.

This notice will serve as notification, for purposes of the Uniform Commercial Code as adopted in all relevant jurisdictions, of the security interest of AEC. This notice will be effective until AEC notifies you in writing that its security interest has been terminated.

AEC has requested, as a condition to provide certain financial accommodations to Landash Corp., that you acknowledge and agree to the following:

(a) You have received this notification of AEC's security interest.

(b) We are current in the payment of your warehouse charges.

(c) You will give AEC access to your warehouse for the purpose of examining our inventory from time to time.

(d) You will commit to AEC as it requests from time to time the amount of inventory being held by you related to AEC's security interest.

(e) With respect to any of our inventory now in your possession, you will not release the inventory without written direction from AEC and and shall honor any instructions issued to you by AEC.

(f) Any lien, interest or encumbrance you may now or hereafter have in our inventory (whether arising or created by statute, by contract or otherwise), shall be and hereby is made subordinate to the security interest of AEC in such inventory. Any proceeds from the sale or other realization of our

> inventory will be applied, first, to the payment to the obligations to AEC and, second, after they have been paid in full, to the payment of our obligations to you. You agree that as long as AEC's security interest is in effect you will not assert your lien, interest or encumbrance, if any, unless AEC has commenced foreclosure or similar enforcement proceedings against the inventory
>
> Please execute this letter to evidence your agreement to the foregoing.
>
> Landash Corp.
>
> By: _[signature]_
>
> Name: JASON Adkins
>
> XPO Global Logistics
>
> By: _[signature]_
>
> Name: _Amir Baltagi_

*Id*.

Abington disbursed the loan proceeds to Mid America on March 17, 2015. However, the sale to Giant Tyres never happened, and Adkins and Landash did not repay the loan.

This suit followed. Relevantly, Abington asserts claims against XPO premised upon Baltagi's conduct for fraud, federal and state RICO violations, civil conspiracy and breach of contract. (ECF No. 205.) XPO denies all claims. (ECF No. 213.)

## II.     PRELIMINARY MOTIONS

### A.     ECF Nos. 330, 339: XPO's Motions to Partially Exclude Expert Testimony of Evan Armstrong

This motion focuses on Abington's fraud claim. Abington argues that it reasonably relied upon the Warehouse Receipt, Inspection Report and Security Letter (collectively "Warehouse Documents") when deciding to disburse the loan proceeds. Abington's proposed expert on this

topic, Evan Armstrong, opines that reliance was reasonable. (ECF No. 349-3.) He posits that

XPO acted unreasonably when responding to a non-party's complaint about an incident that

happened after the Landash deal. *Id*. XPO moves to exclude those opinions under Fed. R. Evid.

702 for lack of expertise. XPO's motion is partially **GRANTED** and partially **DENIED**.

### 1. Rule 702

Federal R. Evid. 702 states:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the evidence or
> to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods;
> and
> (d) the expert has reliably applied the principles and methods to the
> facts of the case.

The rule "imposes a special obligation upon a trial judge to ensure that scientific testimony is not

only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 137 (1999) (citing

*Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993)). This basic gatekeeping obligation

applies to all expert testimony. *Kumho Tire Co.*, 526 U.S. at 147.

"[U]nder *Daubert* and its progeny, a party proffering expert testimony must show by a

'preponderance of proof' that the expert whose testimony is being offered is qualified and will

testify to scientific knowledge that will assist the trier of fact in understanding and disposing of

relevant issues." *Decker v. GE Healthcare* Inc., 770 F.3d 378, 391 (6th Cir. 2014) (citations

omitted). "[T]he issue with regard to expert testimony is not the qualifications of a witness in the

abstract, but whether those qualifications provide a foundation for a witness to answer a specific

question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). Exclusion is proper when

"the subject of the testimony lies outside the witness' area of expertise." 4 Weinstein's Fed. Evid. § 702.06[1], at 702-52 (2000). "In other words, a party cannot qualify as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue." *CDA of Am. Inc. v. Midland Life Ins. Co*., No. 01-CV-837, 2006 U.S. Dist. LEXIS 97327, at *8 (S.D. Ohio Mar. 27, 2006) (Marbley, J.) (citation omitted).

### 2.  Armstrong's Qualifications

The basis for XPO's motion is Armstrong's alleged lack of knowledge about the freight forwarding industry. So, the Court begins by reviewing Armstrong's professional background.

Armstrong's knowledge about XPO predates the company's existence. Armstrong worked for Brad Jacobs before Jacobs purchased Express-1 Expedited Solutions, which became XPO Logistics. Armstrong assisted Jacobs with the Express-1 acquisition and initial strategy for the company. (ECF No. 349 at 18-20.) Armstrong reasons that role gave him insights into "what [XPO] was going to look like" and "what [XPO's] capabilities were going to be." *Id*. Armstrong characterizes himself as a "general industry analyst" who profiles XPO Logistics each year. *Id*.

Armstrong has more than twenty-five years of supply chain management experience. (ECF No. 349-4.) As a customer satisfaction analyst at Roadway Package System, Inc., he analyzed pricing programs and oversaw thirty-six drivers. *Id*. When he worked for Carolina Freight Carriers Corporation as a special projects manager, he managed sales departments. *Id*. In 1995, he joined Innovative Logistics, Inc. as a customer service analyst. *Id*. Next, he spent five months as a logistics project manager at C.H. Robinson Company. *Id*. He then worked for Roadrunner Freight Systems, Inc. as a vice president of pricing and traffic services. *Id*. In that capacity, he was responsible for pricing, claims, billing, rating and the auditing departments. *Id*.

He supervised thirty-two employees, none of whom were branch managers. (ECF No. 349 at 69-70.)

He joined Armstrong & Associates, Inc., his father's company, in 2000 as vice president. *Id*. at 261. Since about 2006, he has served as President of Armstrong & Associates, Inc. *Id*. In that role, he provides consulting services to supply chain participants in the areas of "business planning, logistics outsourcing, mergers and acquisitions, operations benchmarking, market analysis and benchmarking, transportation management, and supply chain systems evaluation and selection." (ECF No. 349-4 at 2.) Consulting accounts for 70% of the company's revenue; marketing, 30%. (ECF No. 349 at 257 and 259.) His company concentrates on market research in, and consulting for, third-party logistics companies. *Id*. A "3PL" is a third-party logistics provider who manages the transportation of goods between the seller and buyer. Armstrong characterizes XPO as a 3PL.

Armstrong & Associates, Inc. has a "strong niche in providing research around the third-party logistics market and performing consulting work that's third-party logistics related." (ECF No. 349 at 254.) The research includes surveys and reviewing annual reports and yields market estimates for logistics costs and revenues. *Id*. The company tracks more than 650 3PLs globally; many of those have freight forwarding services. *Id*. at 138. The company has been publishing reports on contract warehousing in North America since 2004. (ECF No. 349-4 at 2.) Armstrong & Associates also reviews warehousing operations and helps its clients find 3PLs. (ECF No. 349 at 120, 258.) The company works with vendors for 3PLs. *Id*. at 258.

Armstrong's review of XPO's website helped form the basis of his opinion as to what business activities XPO engages in. *Id*. at 61. But his review took place in 2020, not 2015, the year the Adkins deal occurred. *Id*. at 246-47. Armstrong reviewed Concert's operations manual

from 2011 (the year XPO acquired Concert) to formulate his opinion as to XPO's Houston's operations in 2015. *Id*. at 66, 144-46. He "do[esn']t think" that XPO modified Concert's manual because XPO provides services similar to those of Concert. *Id*. He reviewed the Warehouse Documents but did not look at any other invoices from XPO Houston for comparison. *Id*. at 67. He has never been to the Houston location but he has seen pictures of it, and he has been to "a lot" of 3PL warehouses. *Id*. at 67-69, 312. He has no experience managing a freight forwarder location. *Id*. at 68.

### 3. Analysis

XPO moves to preclude Armstrong from testifying about whether: (1) Abington acted reasonably in relying on the Warehouse Documents; (2) the Warehouse Documents comport with industry custom and practice; (3) Baltagi violated XPO's signatory policy in executing the Warehouse Documents; and (4) XPO acted reasonably in responding to an unsatisfied customer in 2016. (ECF No. 339 at 1.) XPO argues that preclusion is necessary because Armstrong lacks the requisite expertise to make his opinions reliable. Abington counters Armstrong has sufficient experience; that exclusion of his noted opinions would serve only to usurp the jury's function; and that Rule 702 permits the opinions to be admitted because they would assist the jury to understand the evidence or to determine a fact in issue.

*Warehouse Documents, Industry Custom and Practice and Baltagi's Signing the Warehouse Documents*. Abington asserts that it relied upon the Warehouse Documents, each of which Baltagi signed, when deciding to disburse the loan. (ECF Nos. 365 at 69 and 341 at 168, 188-93.) XPO contends that reliance was unjustified because the Warehouse Documents were "visibly fake on their face" and "contrary to custom and practice." (ECF No. 339 at 5.) XPO also argues Baltagi did not have authority to execute them. *Id*.

As to the Warehouse Documents' appearance, XPO notes that the Warehouse Receipt did not contain XPO's logo. (ECF No. 338 at 26.) The Warehouse Receipt also listed an address for XPO Logistics, Inc., but referenced XPO Global Logistics and XPO Global Logistics, Inc. elsewhere on the document. *Id*. Additionally, the sections addressing storage and handling rates were not completed. *Id*. The Security Letter contained visible, unaccepted "track changes" and stated that XPO was to take direction about the tires from Abington, a non-customer; it also misspelled "Captal" for Abington Capital. (ECF Nos. 338 at 27 and 349 at 291.) The Inspection Report does not have XPO's logo and it states that the tires are in new condition and "meet all industry standard requirements to be used for the intended purpose." (ECF No. 338 at 28.) The Inspection Report provides that Baltagi is XPO's "proper corporate officer." *Id*. According to XPO, it was obvious that Baltagi, as a branch manager, had neither the knowledge nor the authority to opine as to the tires' suitability for a particular purpose or as to the tires' satisfaction of standard requirements.

In his report, Armstrong opines that "it is standard industry practice for warehouse branch managers to have the authority to sign warehouse receipts, inspection reports, and other documents confirming the receipt, existence, and control of inventory in the management of warehouse operations." (ECF No. 349-4 at 4.) This opinion requires familiarly with paperwork similar to the Warehouse Documents. But Armstrong lacks that familiarity. To be clear, Armstrong testified that he "has seen a lot of agreements," and signed a lot of "shipper contracts." (ECF No. 349 at 286-87, 309-10.) Context, however, is key. Armstrong testified that he has "probably been in 100 warehouses" and "sometimes they'll have standard documents on a blackboard, as well. I've looked at a lot of boards." (ECF No. 349 at 281.) He testified warehouse receipts are "usually scattered out on some desk in a receiving area." (ECF No. 349 at

280.)  He "might have glanced at warehouse receipts as part [of] the receiving process." *Id*. at

281. He googled "warehouse receipts" in connection with this case. *Id*. at 280-81.

      Seeing something and understanding what is seen are different things. To illustrate,

Armstrong could not answer whether a warehousing company would have a template for these

documents or when they should or would be issued. *Id*. at 279-80. He has never drafted a

warehouse security interest letter and has never worked with a lender deciding whether to issue

such a letter. *Id*. at 294-95. He had never reviewed or seen a security interest letter prior to this

case. *Id*. at 299. He could provide no examples of when a 3PL would agree to subordinate its

interest to a lender's. *Id*. at 300.

      As such, he lacks sufficient knowledge as to the content and form of the Warehouse

Documents. Because Armstrong lacks adequate familiarity with the Warehouse Documents, it

follows that he also lacks sufficient understanding of whether said documents comport with

industry custom and practice and whether Baltagi had authority to sign them. Abington has thus

failed to establish by a preponderance of the evidence that Armstrong has the requisite

knowledge to render an opinion that Abington's reliance on the Warehouse Documents was

reasonable, that those documents were in-line with industry custom and practice, and that Baltagi

had the authority to execute the papers. XPO's Motion to Partially Exclude Armstrong's

testimony as to those three topics is **GRANTED**. (ECF Nos. 339 at 1 and 349-4 at Opinion 1.)

     *2016 Customer Complaint*. Star Funding was a client of XPO. Star Funding engaged in a

similar deal with Adkins a year after Abington's Landash deal failed. Adkins also failed to repay

Star Funding's loan. Star Funding's twelve OTR tires were also stored at XPO's Houston

location according to documents Baltagi executed that were identical in all key respects to the

Warehouse Documents in this case. In May 2016, eleven months after the Landash deal failed,

Star Funding complained to XPO that Baltagi had released its tires to Adkins without its consent.[6] Upon receiving the complaint, XPO did not respond that Baltagi lacked authority to authorize the storage of the tires or to execute documents about the tires' location and condition. XPO did not audit of Houston's tire inventory. Rather, one month after receiving the complaint, Baltagi resigned as branch manager. (ECF Nos. 316-3, 316-12.) In July 2016 he became an independent contractor for XPO. *Id*.

Abington argues that XPO should have audited the Houston location and fired Baltagi. Its failure to do so, according to Abington, equates to XPO's ratification of Baltagi's actions and subjects XPO to vicarious liability, especially because Baltagi continued to execute warehouse receipts for other OTR tires stored at the Houston location after the Star Funding complaint. (ECF No. 365 at 85, 101-02, 107.) In support, Abington offers Armstrong's opinion that XPO's "executive management team failed to adhere to standard industry practice by ignoring indicators of poor performance, collections issues, and other operational warnings at its Houston station and refraining from performing a full investigation or audit of the Houston station." (ECF No. 349-4 at p. 13.) Armstrong testified that XPO should have fired Baltagi after Star Funding's complaint. It appears that conclusion is ostensibly meant to imply that by not firing Baltagi and by not conducting an audit of the Houston location, XPO was admitting that Baltagi did have the authority to execute the Warehouse Documents.

Addressing the audit component, Armstrong was not charged with determining whether a fraud audit should be instigated in response to a customer complaint. (ECF No. 349 at 119-20.) Rather, he was asked to opine how an audit should be completed. But Armstrong's deposition reveals limited knowledge as to what should, and should not be, included in a fraud audit. For

---

[6] The tires were never found. Star Funding made an insurance claim for them and received $475,000. (ECF No. 267 at Exs. 99-106.)

example, while he attached a sample warehouse audit checklist to his report, he said the checklist was designed for an operations audit, not a fraud audit. *Id*. at 224. The admittedly incomplete checklist, which does not pertain to freight forwarding operations like XPO Houston, matches that description. *Id*. at 222-225. While there are a few checkboxes for things like instructions for inbound goods, recording of items received and product quantity, the majority of the list focuses on operational issues like eyewash stations, non-smoking signs, fire alarms, handicapped access, pest control and safe forklift speeds. (ECF No. 349-4 at 24-37.) Armstrong testified that a more appropriate checklist would be found at one of the large 3PLs like XPO; this, of course, begs the question of why he, himself, did not procure one prior to his testimony. (ECF No. 349 at 222-23.) His deposition transcript indicates no familiarity with what should be included on a checklist for a fraud audit at a freight forwarding operation, which is what is at issue here. *Id*. at 219-231. He could not confirm that he had ever seen a such a checklist. *Id*.

Armstrong's experience with fraud audits is limited. He participated in a general, non-fraud transportation audit for a freight forwarding client more than five years ago. (ECF No. 349 at 148-153.) That audit involved reviewing freight bills to determine whether the client was being properly charged. (ECF No. 349 at 148-153.) He testified that he participated in an internal audit when working for Roadway Package System. (ECF No. 349 at 118.) Yet, his participation was limited to telling auditors where documents were. *Id*. Neither he nor Armstrong & Associates have performed a fraud audit. *Id*. at 148.

Taking the totality of Armstrong's experience into consideration, the Court holds that Abington has failed to prove by a preponderance of the evidence that Armstrong has the requisite knowledge of audits to satisfy the reliability requirement. He shows limited to no familiarity with what a fraud audit should entail. This lack of knowledge prevents him from determining when

and how a fraud audit should occur. Indeed, he has not directed the instigation of a fraud audit and he has not participated in a fraud audit. For these reasons, XPO's Motion to Preclude Armstrong's testimony as to whether XPO should have conducted a fraud audit at the Houston location upon receipt of Star Funding's Complaint is **GRANTED**.

A different result is reached with respect to Armstrong's opinion that XPO should have fired Baltagi after the Star Funding complaint. Armstrong's opinion is based on his thirty years' of experience in the industry. (ECF No. 349 at 193.) He does have managerial experience and he has terminated employees for "performance issues." *Id*. at 193-94. He also has a substantial work history for, and familiarity with, 3PLs. Abington additionally points to Armstrong's work for Roadway as a customer satisfaction analyst to show that he has been involved in addressing customer complaints. (ECF No. 362 at 10-11.) In contrast, XPO highlights the fact that Armstrong has no experience in human resources and no experience in overseeing branch managers. (ECF No. 349 at 67-69, 192.)

The Court holds that Abington has satisfied its burden to show by a preponderance of the proof that Armstrong's extensive industry experience, coupled with his prior management positions, is sufficient to allow this testimony to be presented to the jury on this issue. The amount of his experience in human resources and with overseeing branch managers goes to credibility, which is an issue for the jury. XPO's Motion to Preclude Armstrong's testimony to the effect that XPO should have fired Baltagi upon the receipt of Star Funding's complaint is **DENIED**.

Lastly, Armstrong's report states that "XPO Logistics/XPO Global failed to adhere to standard industry standards by refraining from fully implementing a warehouse management system in connection with the Houston station's operations." (ECF No. 349-4 at Opinion 2.)

19

XPO moves to preclude the admission of this opinion at trial but fails to articulate a basis for its exclusion. The Court will not fill that void. Hence, XPO's Motion to Preclude Armstrong's testimony on this topic is **DENIED**.

In sum, XPO's Motion to Partially Exclude Expert Testimony of Evan Armstrong is **GRANTED** in part and **DENIED** in part. (ECF Nos. 330, 339.)

### B. <u>ECF No. 331</u>: **XPO's Motion to Partially Exclude Expert Testimony of John T. McGarvey**

Central to XPO's Motion for Summary Judgment on Abington's fraud claim is XPO's contention that Abington failed to conduct reasonable due diligence *before* approving the loan; such diligence, XPO argues, "would have uncovered the fraudulent nature of the transaction and caused any reasonable lender to deny the loan application." (<u>ECF No. 331 at 3</u>.) Abington offers the testimony of Mr. McGarvey, a Kentucky lawyer experienced in the UCC, to establish its diligence was reasonable. Because McGarvey's experience is with "assisting banks *after* the loan has been approved," XPO moves to exclude McGarvey's due diligence opinions under <u>Fed. R. Evid. 702</u> for lack of expertise. (<u>ECF No. 331 at 2</u>)(emphasis added.) Abington predictably counters that McGarvey is qualified to opine on the reasonableness of Abington's due diligence.

The Court has established the requisite analytical framework in the previous section. Hence, the Court reviews McGarvey's professional qualifications and opinions before turning to the issue of exclusion.

#### 1. **McGarvey's Qualifications**

Attorney McGarvey's "practice concentrates in the representation of banks and other lenders in litigation, secured transactions, payment systems, and other matters under the Uniform Commercial Code." (<u>ECF No. 331-2 at 6</u>.) He is "regular[ly] include[ed] in lists such as Best Lawyers in America, . . . [and] Super Lawyers" for banking and finance. *Id*. He represents

Kentucky "as a Commissioner to the Uniform Law Commission and as the chairperson of the commission's Uniform Commercial Code Committee." *Id*.

He taught secured transactions at two law schools. *Id*. at 7. He led "hundreds of seminars on legal issues involving financial institutions and credit extenders" for various bar associations. *Id*. He published articles about UCC Article 9 and served on the Uniform Law Commission's Drafting Committee for the 2010 amendments to Article 9. (ECF No. 351-11 at 1.)

He was last qualified as an expert twenty years ago in two different cases. *Id*. at 7. In the first, his testimony was related to the reasonableness of attorney's fees. In the second, his testimony addressed comparative negligence in a check fraud case. *Id*. at 8.

### 2. McGarvey's Opinion

McGarvey described the Landash loan as "purchase order financing" allowing "a merchant of goods to acquire goods for a prearranged sale at a profit." (ECF No. 331-2 at 2.) He indicated that the Landash transaction was a "straight forward secured transaction in the form of asset-based financing." *Id*. Asset-based financing is covered by Article 9 of the UCC on secured transactions. *Id*.

In evaluating a potential loan, asset-based lenders look primarily "to the collateral in which it obtains a first priority perfected security interest and the ability to liquidate that collateral to satisfy its debt." *Id*. at 3. Collateral is critical in an asset-based loan as it is "an alternative source of payment should a debtor default on credit granted by the secured party." *Id*. The collateral in this loan? The tires. *Id*.

Asset-based loans differ from cash-flow lending. *Id*. at 2. Although both are covered by Article 9 of the UCC, cash flow lenders focus on the credit and cash flow of potential borrowers. *Id*. These lenders "frequently take[] a security interest in personal property . . . in an abundance

of caution." *Id*. "A cash flow lender does careful analysis of a borrower's financial statement, operating statement, and other credit fundamentals, before entering into what is usually a term loan which the lender expects to be amortized over an extended period." *Id*.

Because Abington engages in specialty financing to high-risk borrowers, "it would not be expected to do the same due diligence regarding its customer as would a state and/or federally regulated lender." *Id*. at 4. This is because specialty financiers "are accustomed to taking greater risks, which they mitigate to the extent possible, but also with the expectation of higher returns on the money they extend." *Id*. Furthermore, "asset-based loans, of the nature [Abington] made to Landash, involve an urgent need for funding of a pending transaction that do not lend themselves to extensive investigation and due diligence review." *Id*.

McGarvey posits that Abington's perfecting a first-priority perfected security interest in the tires, visiting XPO's Houston location to make sure it was a secure facility to hold the tires, securing control of the tires while they were located in Houston and ensuring that the tires would not be released until Abington informed XPO that it had received payment was sufficient due diligence. Specifically, he relevantly opines:

> Based on my training and experience in the field of secured transactions, specifically asset-based lending and specialty finance lending, it is my professional opinion to a reasonable degree of certainty that:
> - In the field of asset-based lending, when performing due diligence, the lender considers the collateral in which it takes a first priority perfected security interest over the financial information of the borrower.
> - In the field of specialty finance lending, due diligence is case and fact specific as opposed to formalized due diligence procedures by state and/or federally regulated lending institutions.
> - In the transaction between Abington . . . and Landash . . ., [Abington's] due diligence procedures were reasonable and confirmed to the norms in the asset-based and specialty finance lending industries.

22

(ECF No. 331-2 at 2.)

### 3. Analysis

XPO seeks an order precluding McGarvey from offering opinions or testimony as to: "(1) the reasonableness (or lack thereof) of Abington's due diligence in connection with Adkins' loan request; (2) the steps that a reasonable lender takes or does not take in connection with a transaction like the one at issue here; and (3) the reasonableness of Abington's decision to approve Adkins' loan request." (ECF No. 331 at 11-12.) XPO asserts proper due diligence would have consisted of Abington's performing a criminal background check on Adkins, verifying Adkins' financial documents, and securing an appraisal for the tires. *Id.*

Characterizing McGarvey's experience as focusing on loans *after* the loan has been approved, XPO reasons that McGarvey is unqualified to opine as to due diligence that transpires *before* the loan decision is made. XPO's argument misses the mark. It is the *type* of loan that McGarvey is familiar that is relevant. While traditional, cash flow loans may well require the type of diligence XPO seeks to impose here, asset-based, specialty-financed loans like the Landash transaction play by different rules. Such loans are high-risk, high-return and time sensitive.

McGarvey has more than thirty years' of experience in dealing with asset-based lending and extensive knowledge about Article 9 of the UCC. The Landash loan is an Article 9 transaction. Thus, the Court concludes that Abington has proved by a preponderance of proof that McGarvey has sufficient knowledge and is qualified to testify about due diligence, a topic that will assist the jury in understanding and disposing of relevant issues. XPO's Motion to Partially Exclude Expert Testimony of John McGarvey is **DENIED**. (ECF No. 331.)

### C. <u>ECF No. 364</u>: Abington's Motion to Strike the Declaration of Joshua Allen

Mr. Allen is the President of XPO Global Forwarding. (<u>ECF No. 338-8</u>.) XPO offered his Declaration in support of XPO's Motion for Summary Judgment. *Id*. Abington moves to strike it because it does not contain a wet signature. (<u>ECF No. 364</u>.) Abington also argues XPO did not specifically disclose Allen as a witness and that XPO failed to supplement its initial disclosures with his name. Abington further contends that the Declaration contains inadmissible hearsay, is inconsistent, and is not based on personal knowledge. XPO counters that it timely disclosed its corporate representative, that said representative's knowledge was properly based upon a review of the corporation's business records, and that the Declaration is consistent. (<u>ECF No. 372</u>.)

#### 1. Allen's Signature

Allen's Declaration contains a typed signature. Southern District of Ohio Ci<u>v. R. 83.5(c)</u> allows only actual filers of documents to utilize a "s/" signature, deeming it "equivalent to a hand-signed signature for all purposes, including <u>Fed. R. Civ. P. 11</u> or any other rule or statute." Allen did not file his Declaration; XPO's counsel filed it for him. Additionally, declarations under <u>28 U.S.C. § 1746</u> "must be signed, in writing, and dated, and must verify that its content is 'true under penalty of perjury.'" *Weems v. City of Columbus, Ohio*, No. 2:05-CV-87, <u>2006 WL 2640636</u>, at *3 (S.D. Ohio Sept. 13, 2006) (Graham, J.) (quoting <u>28 U.S.C. § 1746</u>). It follows, then, that a "declaration by a non-attorney which contains an electronic signature instead of the actual signature is not properly signed and therefore is not competent evidence under Rule 56." *Shields v. Sinclair Media III*, Inc., No. 1:18-CV-593, <u>2020 WL 3432754</u>, at *2 (S.D. Ohio June 23, 2020) (Litkovitz, M.J.) (citation omitted). Thus, Abington argues Allen's Declaration must be struck for failure to comport with § 1746, Rule 56, and S.D. Ohio Ci<u>v. R. 83.5</u>. (<u>ECF No. 364 at 19</u>.)

XPO concedes that Allen did not physically sign the Declaration but notes that COVID-19 made it impossible for him to do so given his location in Kentucky and counsels' presence in Ohio. (ECF No. 372 at 14-15.) XPO now offers the same Declaration with Allen's wet signature, and requests leave to file it instanter with retroactive application to the date of XPO's summary judgment filing. (ECF No. 372 at 15.)

XPO's Motion for Leave is **GRANTED**. The Court prefers to decide questions before it on the merits, not on technicalities, especially when the claimed error has been promptly remedied as it has here. Mr. Allen's Declaration containing his wet signature, attached as Exhibit 2 to XPO's Opposition to Abington's Motion to Strike, is hereby filed instanter with a filing date of June 3, 2020. *See* ECF No. 338.

### 2. Failure to Disclose, Specify and Supplement

Abington argues XPO's failure to specifically identify Allen in its disclosures and responses to Abington's discovery requests violates Fed. R. Civ. P. 26. "A party who violates Rule 26 may not use the offending information or witness 'on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.'" *Medpace, Inc. v. Biothera*, Inc., No. 1:12-cv-179, 2013 U.S. Dist. LEXIS 167196, at *3 (S.D. Ohio Nov. 25, 2013) (Black, J.) (quoting Fed. R. Civ. P. 37(c)(1)).

### a. Failure to Specify

XPO's January 2019 Rule 26(a)(1)(A)(i) initial disclosures provided that:

> Representative(s) of XPO may testify regarding the allegations and defenses implicated by the complaint; any communications between XPO and any other persons or entities identified above; any services rendered to Adkins and Adkins' companies; the OTR tires at issue in the loan transaction identified in the complaint; documents related to OTR tires; the scope of Baltagi's authority while employed with XPO; and related issues. XPO can be contacted through its counsel.

(ECF No. 364-1 at 5.) Abington argues that this disclosure of XPO's corporate representative was insufficient because it did not specify that Allen would be serving in this role. (ECF No. 364 at 3.) In support, Abington notes that Rule 26(a)(1)(B) provides that a party must, without waiting for a discovery request, provide the other party with the name and contact information for each individual likely to have discoverable information. *Id.*

XPO counters that its initial disclosure comports with Rule 26(a)(1)(A)(i) pursuant to *Garrett v. Trans Union, L.L.C.*, No. 2:04-CV-00582, 2006 U.S. Dist. LEXIS 73395 (S.D. Ohio Sep. 29, 2006) (Smith, J.). In that case, Garrett moved to strike the affidavit of Defendant Citifinancial's corporate representative offered in support of Citifinancial's motion for summary judgment because Citifinancial had never specifically identified the representative or any other witness. *Garrett,* 2006 U.S. Dist. LEXIS 73395 at *19. The court denied the motion because: (1) there was no failure to disclose pursuant to Rule 26(a)(1); (2) there was no prejudice whether the witness was listed as a "Citifinancial representative" or "Citifinancial representative Joe Barbone" and Garrett articulated no prejudice; (3) the failure of Garrett to depose a Citifinancial representative was solely because of Garrett's own lack of diligence; and (4) even if there was a discovery violation, the violation was harmless because Plaintiff always knew that a representative of Citifinancial would testify. *Id.*

Abington attempts to both differentiate and discount *Garrett*. In a footnote, Abington asserts *Garrett* is not persuasive because Garrett should have expected that someone would be submitting evidence on behalf of Citifinancial and Garrett did not depose any Citifinancial employees. (ECF No. 381 at 7 n.11.) Abington, in contrast, had "no reason to believe another witness beyond those identified by XPO would be submitting evidence in this case" and it did depose a number of XPO's identified witnesses. *Id.* Abington also argues that Citifinancial

allowed Garrett to depose the corporate representative whom executed the affidavit after the discovery deadline. *Id.* Abington maintains it did not get that opportunity here. *Id.* Additionally, Abington cites to numerous out-of-circuit cases and Moore's Federal Practice for the proposition that "parties must provide the specific names of the individuals they might use as witnesses. It is not sufficient to identify them through the use of a collective description, such as 'employees or representatives of the defendant'" to satisfy Rule 26. (ECF No. 381 at 6) (quoting 6 Moore's Federal Practice – Civil § 26.22 (2020)).

Unquestionably, courts disagree as to whether Rule 26 requires the specificity Abington seeks. *See Meltzner v. Anthem Ins. Cos.*, No. CIV-17-1023-SLP, 2019 U.S. Dist. LEXIS 92638, at *3 (W.D. Okla. June 3, 2019) (holding generic listing of "corporate representative" acceptable); *but see Geico Cas. Co. v. Beauford*, No. 8:05-CV-697-T-24EAJ, 2007 U.S. Dist. LEXIS 61379, 2007 WL 2412953, at *5 (M.D. Fla. Aug. 21, 2007) (finding "corporate representative" insufficient under Rule 26). Within this District, judges concur that it satisfies Rule 26 for a corporate party to identify an unnamed representative as a potential witness. *See Garrett*, 2006 U.S. Dist. LEXIS 73395, at *18-19; *see also Medpace, Inc.*, 2013 U.S. Dist. LEXIS 167196. The Court sees no reason to depart from *Garrett* and *Medpace* in the case *sub judice*.

Abington's attempts to distinguish *Garrett* are unsuccessful. XPO's identification of certain individuals as witnesses while failing to specify the corporate representative indicates that such representative was not one of the specified individuals. Abington could have simply contacted XPO's counsel and asked who the representative was before noticing a deposition, but Abington chose not to. Additionally, Abington could have moved to compel XPO to specifically identify the corporate representative when receiving either XPO's January 2019 initial

disclosures or April 2019 discovery responses. Again, Abington chose not to do so. And while Abington may not have known about Allen's deposition prior to it being taken in a related case, it certainly did after. It was Abington who filed Allen's deposition in this case, and Abington did so on the summary judgment deadline and before XPO filed Allen's Declaration. Allen's December 2019 deposition indicates that he was XPO's "designee."  (ECF No. 329-1 at 16.) This means that Abington was aware of Allen's "designee" status as a deponent in a related case prior to the dispositive motion deadline here. Yet, Abington failed to move the court to re-open discovery. Any claimed prejudice, therefore, is the result of Abington's own inaction.

Additionally, Abington does not point to any averments within the Declaration that differ from Allen's deposition testimony. And, Abington actually relies upon Allen's deposition in support of its Motion to Strike as well as its Opposition to XPO's Motion for Summary Judgment. (ECF No. 364 at 13.)  Because Abington was not only aware of the deposition testimony but relies upon it, Abington cannot now claim surprise.

XPO's designation of its corporate representative satisfied Rule 26, and Abington's Motion to Strike Allen's Declaration pursuant to Rule 37 is **DENIED.** (ECF No. 364.) This holding negates the need to analyze XPO's alternative argument that corporate representatives are not individuals within the meaning of Rule 26 such that the rule is inapplicable to corporate witnesses. (ECF No. 372 at 3-5.)

### b.  Duty to supplement

Abington also highlights that its March 2019 interrogatories and requests for production asked XPO to "identify each and every person [XPO] believe[s] has an[y] information relevant to the subject matter of this litigation . . . ." (ECF No. 285-3.) XPO responded by specifically

naming a list of individuals but also indicating that an unnamed corporate representative may

have information regarding:

> the allegations and defenses implicated by the complaint; any
> communications between XPO and any other persons or entities
> identified above; any services rendered to Adkins and Adkins'
> companies; the OTR tires at issue in the loan transaction identified
> in the complaint; documents related to OTR tires; the scope of
> Baltagi's authority while employed with XPO; and related issues.

 (ECF No. 364-2 at 10.) Abington questions XPO's decision to name other individuals while

omitting the name of its corporate representative, especially when that representative is XPO

Global's President. To that point, Abington notes XPO's duty to supplement under Rule

26(e)(1)(A), which implies that duty when a party learns "that in some material respect the

disclosure or response is incomplete or incorrect, and if the additional or corrective information

has not otherwise been made known to the other parties during the discovery."

It is the later part of the rule that forecloses the relief Abington seeks. "[T]here is no need

as a matter of form to submit a supplemental disclosure to include information already revealed

by a witness in a deposition or otherwise through formal discovery." 8C Wright & Miller, Fed.

Prac. & Proc. § 2049.1 (3d ed. 2010); *see also Moore v. Computer Assocs. Int'l, Inc.*, 653 F.

Supp. 2d 955, 959-60 (D. Ariz. 2009) (finding that corporate witness was "designated under

Federal Rule of Civil Procedure 30(b)(6), and thus Rule 26 disclosure was not required.").

As noted above, Abington's filing Allen's deposition transcript in this case evinces Abington's

awareness of Allen's deposition testimony as XPO's "designee" prior to the dispositive motion

deadline. Moreover, Abington fails to argue how Allen's Declaration differs from his deposition.

From all of this, any claimed surprise is illogical. Accordingly, Abington's Motion to Strike

Allen's Declaration under Rule 26(e)(1)(A) is **DENIED**.

### c. Personal Knowledge

Rule 56(c)(4) states that an "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Noting that Allen did not work for XPO Global until 2019, well after the alleged fraud took place, Abington asserts that Allen lacks the personal knowledge necessary to render his Declaration admissible. (ECF No. 364 at 13.) Accordingly, it maintains that the entire Declaration must be stricken from the record. XPO responds that Allen's personal knowledge is imputed by his corporate representative status. (ECF No. 372 at 9-10.)

XPO is correct. As XPO's corporate representative, Allen is "considered to have personal knowledge of the acts of [the corporate defendant] and an affidavit setting forth those facts is sufficient for summary judgment." *D&D Underground Utils. Inc. v. Walter Martin Excavating Inc.*, No. 12-241-GFVT, 2015 U.S. Dist. LEXIS 59666, at *10 (E.D. Ky. May 7, 2015) (quotation and citation omitted)).

> It is generally held that personal knowledge of a company's operations can be inferred from an affiant's position within a company or business. Common sense dictates that a corporate officer . . . has knowledge of his company's operations both because he himself happens to have participated in some such operations, and because the company has employees who have told him information about others. This is presumably the case in any business enterprise large enough to have employees; many CEOs could testify in their capacities as corporate officers concerning the general policies of their companies' mail rooms or cafeterias, but few would be speaking from personal employment experience.

*Charvat v. Echostar Satellite, LLC*, No. 2:07-cv-1000, 2009 U.S. Dist. LEXIS 61059, at *8-9 (S.D. Ohio July 16, 2009) (Abel, M.J.) (citations omitted), adopted by *Charvat v. EchoStar Satellite, LLC*, No. 2:07-cv-1000, 2009 U.S. Dist. LEXIS 83106, at *1 (S.D. Ohio Sep. 11, 2009)

(Holschuh, J.). Abington's protestation that the Rule 30(b)(6) imputation occurs only for depositions and not affidavits or declarations is unpersuasive, as numerous courts have applied this general rule to such evidentiary materials in the summary judgment context. *See Lloyd v. Midland Funding, LLC*, 639 F. App'x 301, 305 (6th Cir. 2016); *see also Charvat*, 2009 U.S. Dist. LEXIS 61059, at *8-9. Thus, Allen has personal knowledge via his status as XPO's corporate representative.

Abington also argues that Allen cannot enjoy the rule's imputation of knowledge because he was not deposed in this case. To repeat, Abington chose not to inquire as to the identity of XPO's corporate representative. Abington further chose not to depose XPO's representative. In addition, Allen was deposed in a related case and Abington filed his deposition in this matter. Hence, Abington was aware of his deposition.

Allen's Declaration states that he has "personal knowledge of the facts set forth herein and they are within [his] personal knowledge or were learned through the review of documents of XPO." (ECF No. 372-2 ¶ 1.) Those documents were business records, which are an exception to the hearsay rule. *See* Fed. R. Evi. 803(6). He therefore familiarized himself with the facts and his Declaration was based on his personal knowledge. *Lloyd*, 639 F. App'x at 305.

Consequently, Abington's lack of personal knowledge argument is unavailing and Abington's Motion to Strike Allen's Declaration is **DENIED** on this ground. (ECF No. 364.)

### 3. Paragraphs 9, 10, 11

Abington moves to strike the noted paragraphs from Allen's Declaration as based on hearsay. (ECF No. 364 at 11; ECF No. 381 at 4-5, 8.) Abington also characterizes portions of those paragraphs as speculative and asserts that the Declaration is not based on personal

knowledge. *Id*. XPO argues that the paragraphs are fully admissible. The Court will address each paragraph in turn.

### a. Paragraphs 9 and 11

Paragraph 9 provides:

> I have reviewed the Warehouse Inspection Report Baltagi is alleged to have signed and he was not authorized to sign this document. Baltagi would have known he was not authorized to sign this type of document because XPO Global Forwarding did not provide this type of inspection service, and Baltagi had not been authorized by XPO to provide these services.

(ECF No. 372-2 at ¶ 9.) Similarly, Paragraph 11 states:

> I have reviewed the Warehouse Receipt Baltagi is alleged to have signed and he was not authorized to sign this document. Baltagi would have known he was not authorized to sign this type of document because XPO Global Forwarding did not perform warehouse services at the Houston branch. Any warehousing services would have been outsourced to a third-party, like RoadMaster. Baltagi was not authorized by XPO to offer warehousing services performed by XPO because XPO did not provide warehousing services at the Houston branch.

*Id*. at ¶ 11. Abington focuses on the sentence in both paragraphs stating that Baltagi "would have known he was not authorized to sign this type of document" to argue that the entire paragraphs must be struck under Fed. R. Evid. 602 as inadmissible speculation. (ECF No. 364 at 17-19.) Rule 602 provides "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony."

XPO responds that adequate circumstantial evidence can establish personal knowledge. (ECF No. 372 at 13-14.) In support, XPO cites to *State v. Blankenship*, 5th Dist. Delaware No. 16-CAA-24, 2017-Ohio-7267, ¶ 43, a state criminal matter that proceeded to a jury trial, for the proposition that "circumstantial evidence has the same probative value as direct evidence" and

argues such evidence is present here. Specifically, XPO references deposition testimony from other XPO representatives indicating that Baltagi lacked authority to sign the Warehouse Documents pursuant to XPO's Contract Policy ("Contract Policy"). (ECF No. 372 at 13-14.) The Contract Policy required Baltagi to obtain XPO's approval before signing documents containing terms and conditions on behalf of the company. XPO mentions its expert's opining that industry custom would not have permitted Baltagi to sign the Warehouse Documents. (ECF No. 372 at 13-14.) XPO also asserts that Baltagi was hiding his behavior from his superiors, apparently implying that Baltagi knew that his actions with respect to the Warehouse Documents were not permitted. *Id.*

XPO's arguments fail. Allen declares that he has "personal knowledge of the facts set forth herein and they are within [his] personal knowledge or were learned through the review of documents of XPO." (ECF No. 372-2 ¶ 1.) As Abington correctly notes, Allen does not claim knowledge based on the circumstantial evidence XPO cites. (ECF No. 381 at 9.) Indeed, as a Rule 30(b)(6) representative, his knowledge comes from his review of XPO's documents. Allen's statement that Baltagi "would have known" he was not permitted to sign the Warehouse Documents is entirely speculative, not factual.

Consequently, the Court will **STRIKE** and not consider the following language from Paragraph 9: "Baltagi would have known he was not authorized to sign this type of document." (ECF No. 372-2 at ¶ 9.) The rest of the paragraph stating that XPO Global Forwarding did not provide inspection services and that Baltagi had not been authorized by XPO to provide these services shall remain, as these are issues within Allen's personal knowledge as a corporate representative.

The same result is reached for Paragraph 11. That is, the Court **STRIKES** "Baltagi would have known he was not authorized to sign this type of document." (ECF No. 372-2 at ¶ 11.) The remainder of the paragraph will remain for the same reasons as Paragraph 9.

In sum, Abington's Motion to Strike Paragraphs 9 and 11 is **GRANTED** in part as described above. (ECF No. 364 at 17-19.)

### b. Paragraph 10

This paragraph states:

> I have reviewed the Warehouse Security Interest Letter Baltagi is alleged to have signed and he was not authorized to sign this document absent approval from the XPO contract team or legal department, per the . . . [Contract Policy] attached as Ex. 1. *Baltagi did not seek or receive approval from the XPO contract team or legal to sign the Warehouse Security Interest Letter, the Inspection Report, or the Warehouse Receipt.*

(ECF No. 372-2 ¶ 11) (emphasis added). Abington offers three grounds in support of its request to strike the italicized language from the Declaration: lack of personal knowledge, lack of evidence, and lack of consistency. (ECF No. 364 at 12-16.)

*Lack of Personal Knowledge*. To begin, Abington argues that Allen could not have personal knowledge about whether Baltagi sought approval prior to signing the Warehouse Documents because Allen never met Baltagi or spoke with Baltagi's supervisors. *Id*. at 13. This argument fails, as Allen's corporate representative status does not require personal knowledge. "There is no obligation to select a person with personal knowledge of the events in question, so long as the corporation proffer[s] a person who can answer regarding information known or reasonably available to the organization." *Lloyd*, 639 F. App'x at 305 (internal quotation, emphasis and citation omitted). Whether Baltagi did, or did not, seek approval is "reasonably available" to Allen via XPO's documents. Furthermore, "[w]hen a corporation offers testimony

of a representative, the corporation appears vicariously through that agent. The authority of a corporate representative extends not only to facts, but also to the subjective beliefs and opinions of the corporation." *Harrington v. RoundPoint Mortg. Servicing Corp.*, No. 2:15-cv-322-FtM-38MRM, 2017 U.S. Dist. LEXIS 55022, at *14-15 (M.D. Fla. Apr. 10, 2017) (quotation and citation omitted). The sentence in focus will not be stricken for lack of personal knowledge.

Next, Abington argues Allen cannot declare that his review of relevant XPO documents establishes that Baltagi failed to seek approval. Because Allen's knowledge is based upon a review of XPO's documents, Abington notes that the Declaration does not contain language addressing the requirements of the business record hearsay exception detailed in Rule 803(6). Thus, Abington reasons, Allen's Declaration should be struck as his knowledge is based upon a review of documents that have not been authenticated or established to be non-hearsay. (ECF No. 364 at 14-17.) XPO does not address this argument.

While Abington is correct that the Declaration lacks the "magic language," Abington does not argue or "show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Rule 803(6)(E); *see also Lewis v. Residential Mortg. Sols.*, No. 1:17-CV-1422-ELR-WEJ, 2018 U.S. Dist. LEXIS 220680, at *13-14 (N.D. Ga. Aug. 31, 2018) (declining to strike unauthenticated business records from corporate representative's affidavit for lack of authentication under same rule). Additionally, evidence submitted at summary judgment in non-admissible form may still be considered at that stage if the evidence could be presented in admissible form at trial. *Barry v. Lyon*, 834 F.3d 706, 722 (6th Cir. 2016). Here, testimony of XPO's records custodian could authenticate the business records mentioned in Allen's Declaration. Furthermore, "[t]he absence or extent of personal knowledge regarding preparation of a business record affects the weight rather than the

admissibility of the evidence" and is therefore a jury issue. *Chadwick v. Bank of Am., N.A.*, 616 F. App'x 944, 948 (11th Cir. 2015) (per curiam) (quotation and citation omitted). This ground for striking is unavailing.

Third, Abington notes that more than 64,000 documents were produced in this case but Allen testified that he only reviewed "two bankers boxes" of XPO's documents. (ECF No. 364 at 14.) Abington asserts that the Declaration fails to identify each document he reviewed to arrive at his conclusion. XPO does not address the later contention. As to the former, XPO cites to Allen's deposition wherein he testified that he reviewed "thousands" of documents, inclusive of depositions and two bankers boxes, in addition to meeting with counsel for almost fifty hours, to prepare for his deposition. (ECF No. 372 at 12.)

Given the number of documents involved, is it is simply not practical for Allen to attach every document he reviewed to his Declaration. Moreover, as is mentioned above, his Declaration allows him to speak to facts known by XPO. The level of support for the conclusion that Baltagi did not seek approval "may be discerned as a matter of weight." *Harrington*, 2017 U.S. Dist. LEXIS 55022, at *16 (holding similarly).

In sum, Abington's personal knowledge contentions do not warrant striking the Declaration's highlighted language. The Motion to Strike is **DENIED** on this ground.

*Lack of Evidence*. Abington argues the Court should strike the sentence because it is unsupported by evidence. In support, Abington first highlights XPO's failure to provide documents showing that Baltagi did not seek approval before executing the Warehouse Documents. (ECF No. 364 at 14.) Allen's declaration that Baltagi did not seek approval is based on Allen's personal knowledge via his review of XPO's business records as XPO's corporate representative. XPO cannot produce what does not exist. Secondly, Abington claims that no

"witness with personal knowledge has testified that Baltagi failed" to request approval. (ECF No. 364 at 14.) But Allen's averment on this point does not need witness corroboration. His testimony is premised upon his personal knowledge as corporate representative.

Third, Abington asserts that XPO's failure to produce proof showing that Baltagi actually received the Contracts Policy dooms Allen's conclusion. But whether Baltagi received the Contracts Policy and whether he sought approval are two separate issues. The Declaration's failure to address the latter does not render the former unsupported.

Consequently, Abington's Motion to Strike the sentence in Paragraph 10 on lack of personal knowledge grounds is **DENIED**. (ECF No. 364.)

*Lack of consistency.* Abington avers that the Declaration's attempt to authenticate the attached Contracts Policy is "contradictory" because the Declaration indicates that the attached Contracts Policy was in effect since November 2012 but the version attached to the Declaration shows that it was revised and updated in August 2014. (ECF No. 364 16-17.) This contradiction, Abington maintains, warrants exclusion of the sentence. XPO responds that it attached the August 2014 version to the Declaration because that was the version in effect at the time of the events in focus. (ECF No. 372 at 13.)

Both sides are wrong. The Contracts Policy attached to the Declaration specifically states it was "adopted December 9, 2014." (ECF No. 338-8 at 5.) This corresponds to the chart of revisions located on the last page of the Contracts Policy, which provides that the last revision was made on that date. So, the version attached to the Declaration appears to be that in effect in March 2015 and XPO's reference to August 2014 as the controlling version is incorrect. However, this inconsistency does not demand the sentence's exclusion because Abington fails to

argue the error caused it any prejudice and to argue that the December 2014 version was not the operative version.

Lastly, in its reply, Abington maintains for the first time that the Declaration must be stricken because it contains "obvious untrue statements." (ECF No. 381 at 9-10.) Abington then lists its examples of such alleged statements. (ECF No. 381 at 9-10.) "A reply brief is not the proper place to raise an issue for the first time." *United Tel. Co. of Ohio v. Ameritech Servs., Inc.*, No. 2:10-cv249, 2011 WL 53462, at *3 n. 2 (S.D. Ohio Jan.7, 2011) (Frost, J.). Consequently, the Court need not and will not consider Abington's new or newly recast arguments. *See Versatile Helicopters v. City of Columbus*, No. 2:10-cv-1110, 879 F. Supp. 2d 775, 779 (S.D. Ohio July 18, 2012) (Frost, J.) (abstaining from consideration of argument raised for the first time in a summary judgment reply memorandum).

Abington's Motion to Strike the sentence in Paragraph 10 based on alleged inconsistencies is **DENIED**.

To summarize, Abington's Motion to Strike Allen's Declaration is **GRANTED** in part and **DENIED** in part as indicated above. (ECF No. 364.)

### D. ECF Nos. 335, 340: Abington's Motion for Adverse Inferences Against Baltagi and XPO

Both Abington and XPO deposed Baltagi but he invoked the Fifth Amendment for every question asked. Abington now seeks imposition of adverse inferences against Baltagi and XPO for summary judgment and trial. Specifically, Abington wants an adverse inference applied to the following:

> • Questions related to Baltagi's employment status with XPO (A. Baltagi Dep., pp. 12-13 (Doc. No. 266-1, Page ID 10423-10424));

• Questions related to Baltagi's actions taken in furtherance of the interests of XPO (*Id.*, pp. 13-14 (Doc. No. 266-1, Page ID 10424-10425));

• Questions related to the management of inventory at XPO (*Id.*, p. 14 (Doc. No. 266-1, Page ID 10425));

• Questions related to whether Baltagi signed and transmitted documents with false information to Abington and whether Abington was relying on those documents (Id., pp. 14-15 (Doc. No. 266-1, Page ID 10425-10426));

• Questions related to Baltagi's authority as a branch manager and later independent contractor for XPO (Id., pp. 15-16 (Doc. No. 266-1, Page ID 10426-10427)); and

• Questions related to benefits received by XPO as a result of Baltagi signing certain documents (Id., pp. 16-17 (Doc. No. 266-1, Page ID 10427-10428)).

(ECF No. 378 at 2.) XPO opposes. (ECF No. 360.)  Baltagi did not respond.

## 1. Analytical Framework

The Fifth Amendment privilege "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution, but also privileges him not to answer questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *In re Morganroth*, 718 F.2d 161, 165 (6th Cir. 1983) (citation omitted.) The trier of fact in a civil case may draw an adverse inference against a party for invoking his Fifth Amendment privilege. *See Baxter v. Palmigiano*, 425 U.S. 308 (1976).

The Second Circuit's decision in *LiButti v. United States*, 107 F.3d 110 (2nd Cir. 1997), provides the leading authority for examining Abington's request. The drawing of adverse inferences hinges on the circumstances of the particular case at issue. *LiButti*, 107 F.3d at 123. Those circumstances are examined within the following factors when determining whether to

apply the adverse inference: (1) the nature of the relevant relationship; (2) the degree of control of the party over the witness; (3) the compatibility of the interests of the party and the witness; and (4) the role of the witness in the litigation. *Id*. at 123-24. When considering the factors "the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *Id*. at 124.

Although *LiButti* applied the factors to a non-party witness and Baltagi is a party witness, both sides relied upon those elements when making their respective arguments and the Court agrees that they apply here. "[N]othing forbids imputing to a corporation the silence of its personnel" and the "mere fact that the witness no longer works for the corporate party should not preclude as evidence his invocation of the Fifth Amendment." *Rad Servs., Inc. v. Aetna Cas. & Sur. Co*., 808 F.2d 271, 275 (3d Cir. 1986).

Imputation also applies to different types of defendants. "Adverse inferences drawn against the individual defendants may also be drawn against the corporate defendant because the individual defendants were acting in the scope of their employment when they engaged in the conduct they refused to testify about." *SEC v. Monterosso*, 746 F. Supp. 2d 1253, 1263 (S.D. Fla. 2010). Baltagi is the individual defendant and XPO is the corporate defendant. In sum, what Abington seeks may be permissible if the *LiButti* factors are satisfied.

## 2. Summary Judgment Motion

While keeping the ultimate goal of trustworthiness in mind, the Court first considers the non-exclusive *LiButti* factors in the context of Abington's request to apply the adverse influence to the Court's summary judgment determination.

*The Nature of the Relevant Relationships*. According to *LiButti*:

> While no particular relationship governs, the nature of the relationship will invariably be the most significant circumstance. It should be examined, however, from the perspective of a . . . witness' loyalty to the plaintiff or defendant, as the case may be. The closer the bond, whether by reason of blood, friendship or business, the less likely the non-party witness would be to render testimony in order to damage the relationship.

*LiButti*, 107 F.3d at 123. Baltagi's loyalty to XPO therefore comes into focus. The deeper the loyalty, the less likely Baltagi would want to render testimony adverse to XPO.

On this point, Abington first argues that XPO maintained its association with Baltagi as an independent contractor after learning in October 2017 about similar allegations in related litigation, *Great Southland Limited v. Landash Corporation, et al.*, 17cv-719. (ECF No. 365 at 83.) This, according to Abington, makes Baltagi loyal to XPO. Yet, XPO correctly notes that the original Great Southland Complaint did not mention Baltagi at all. Abington then argues that XPO defended Baltagi in connection with a subpoena Abington issued in this matter, again inferring Baltagi's loyalty. XPO concedes it hired and paid for an attorney to represent Baltagi as to a subpoena in October 2017, but states that was before Abington filed its Second Amended Complaint in this case in February 2018 detailing the alleged role of Baltagi and naming he and XPO as defendants for the first time. At that time, XPO stopped paying Baltagi's legal fees (which totaled $6,000 for the four-month period between October 2017 and February 2018). Less than two months after the Second Amended Complaint was filed in this matter, XPO terminated Baltagi's independent contractor status. Given the short duration of XPO's underwriting of Baltagi's fees, and its relativity quick ending of Baltagi's independent contractor status after the Second Amended Complaint's filing, the Court affords little weight to Abington's loyalty arguments on these points.

Second, Abington complains that XPO did not turn over e-mails between Baltagi and XPO's former associate general counsel, Susan Santo, during discovery in this matter. Attorney Santo was at the helm of XPO's response to this litigation for one year. (ECF No. 360 at 8.) XPO refused to produce the e-mails, claiming that they were attorney-client privileged. Abington contends that XPO cannot argue that Baltagi was acting outside the scope of his employment but still maintain that the e-mails are privileged.

The topic of Susan Santo's e-mails has been excessively litigated and fully resolved. *See* ECF Nos. 230, 241, 248, 255, 274, 276, 277, 280, 294, 295, 297, 308-10, 317, 321. Abington's argument that "XPO made a concerted effort to funnel factual information and business decisions through both inside and outside counsel to cloak those issues in attorney client privilege" is both inflammatory and unfounded. (ECF No. 340 at 9.) The Court's November 9, 2019 Order held "even if Mr. Baltagi was acting outside of the course and scope of his employment—which the Undersigned is not in a position to conclude—Ms. Santo was unaware of that fact, and importantly, their email correspondence still 'concern[s] matters within the scope of [his] [ ] corporate duties.'" (ECF No. 321 at 5) (internal quotations and citation omitted). The privilege belongs to the client—here, XPO. *Id.* Thus, it is not necessarily indicative of a close bond between Baltagi and XPO.

Third, Abington argues that XPO's decision to "reclassify" Baltagi as an independent contractor after Star Funding's 2016 complaint to XPO establishes Baltagi's loyalty to XPO because Baltagi would want to continue on as an independent contractor. (ECF Nos. 340 at 10-12 and 365 at 83.) XPO counters that the Star Funding complaint is irrelevant in this context because Star Funding occurred more than a year after the pertinent events in this case and did not involve Abington. There is no dispute that XPO and Baltagi had a business relationship for many

years. However, by the time that Baltagi invoked the Fifth Amendment, that relationship had terminated and he had no incentive to be loyal to XPO.

Abington also derides XPO's failure to inform "victims of the Ponzi scheme, like Abington, that Baltagi lacked authority to sign" the Warehouse Documents. *Id*. at 12. As to the failure to inform, XPO states that it did not become fully aware of Baltagi's alleged actions until February 2018 when Abington filed the Second Amended Complaint in this case; thus, it could not have alerted the alleged victims earlier. Without evidence to contradict XPO's assertion regarding the timing of its knowledge as to the scope of Baltagi's conduct, Abington's argument that XPO's failure to inform others reflects loyalty to Baltagi is misplaced.

Having considered all of the arguments as to the relationship between Baltagi and XPO, the Court finds that this "most significant" factor weighs in favor of finding the adverse inference untrustworthy. *LiButti*, 107 F.3d at 123.

*The Degree of Control of the Party Over the Witness*. "The degree of control which the party has vested in the . . . witness in regard to the key facts and general subject matter of the litigation will likely inform the trial court whether the assertion of the privilege should be viewed as akin to testimony approaching admissibility under Fed. R. Evi. 801(d)(2)[7], and may accordingly be viewed . . . as a vicarious admission." *LiButti*, 107 F.3d at 123-24. *LiButti* does not directly specify when the Court should measure the degree of control. The parties' arguments focus on this omission.

---

[7] Federal R. Evid. 801(d)(2) provides that, *inter alia*, statements from an opposing party are not hearsay when they were made by a party in an individual or representative capacity; when they were made by a person whom the party authorized to make a statement on the subject; or when they were made by the party's agent or employee on a matter within the scope of that relationship and while it existed.

Not surprisingly, Abington argues that XPO has substantial control over Baltagi and XPO argues it has none. Abington maintains that the relevant time period is 2015, when the underlying events transpired and Baltagi was XPO's employee. To buttress this contention, Abington points to *Rad Servs., Inc. v. Aetna Cas. & Sur. Co*., <u>808 F.2d 271</u> (3d Cir. 1986), where the court held the inference could apply despite the fact that the witness was not defendant's employee at the time the Fifth Amendment was invoked. *Rad Services*, <u>808 F.2d at 275</u>.

XPO, in contrast, argues that the appropriate timeframe is 2019, when Baltagi invoked the privilege and was no longer a XPO employee. XPO cites to several cases declining to draw the adverse influence based, in part,  on the deponent not being an employee at the time of the Fifth Amendment's assertion. (<u>ECF No. 360 at 11-13</u>) (citing *United States ex rel. Debra Hockett v. Columbia/HCA Healthcare Corp*., <u>498 F. Supp. 2d 25, 61</u> n.25 (D. D.C. 2007) (holding witness's relationship to defendant, particularly at the time he pled the Fifth when he was not defendant's employee and defendant exercised no control over him, "does not render the inference trustworthy when used against" the defendant)); *In re Urethane Antitrust Litig*., MDL No. 1616, <u>2013 U.S. Dist. LEXIS 3166, at *31</u> (D. Kan. Jan. 8, 2013) (declining to apply inference partly because "at the time they invoked the Fifth Amendment, these witnesses had no relationship to [defendant], against whom this evidence is offered" and because plaintiffs conceded [defendant] did not exercise control over the witnesses at the time they invoked the Fifth); and *Miller v. Pilgrim's Pride Corp*., No. 5:05CV00064, <u>2008 U.S. Dist. LEXIS 3305, at *25</u> (W.D. Va. Jan. 16, 2008) (finding second *LiButti* factor weighed against application of the inference because witness was no longer employed by defendant-employer at the time of her trial testimony).

The ultimate goal of the analysis is the trustworthiness of an adverse inference. The Court finds that focusing on the relationship at the time the privilege is invoked leads to a more trustworthy result. This is the point at which the nature of the relationship is most relevant because it most accurately reflects the nature and degree of control the defendant has over the witness when the privilege is invoked. Because Baltagi was not XPO's employee at the time he invoked the Fifth Amendment, XPO had no control over Baltagi. The second *LiButti* factor therefore counsels towards finding the adverse inference untrustworthy.

*The Compatibility of the Interests of the Party and Witness in the Outcome of the Litigation*: "The trial court should evaluate whether the . . . assertion of the privilege advances the interests of both the . . . witness and the affected party in the outcome of the litigation." *LiButti*, 107 F.3d at 123-24.

Analysis on this point is short. While both XPO and Baltagi share the common interest of a judgment adverse to Abington, their interests diverge because XPO has asserted crossclaims against Baltagi. Abington's attempt to characterize XPO's decision to refrain from seeking default on those claims as evidence of alignment with Baltagi is unsuccessful. Failure to proceed to default could be litigation strategy combined with knowledge that such a motion would likely not be addressed until after trial in order to avoid inconsistent judgments. Further, Baltagi's invoking the Fifth Amendment serves to harm XPO by preventing it from learning key facts supporting its theory that Baltagi was a rogue employee controlled by Adkins. Hence, the interests of XPO and Baltagi in the outcome of this matter are more adverse than cohesive and this element counsels towards finding the adverse inference untrustworthy.

*The Role of the Witness in the Litigation*: "Whether the . . . witness was a key figure in the litigation and played a controlling role in respect to any of its underlying aspects also logically merits consideration by the trial court." *LiButti*, 107 F.3d at 123-24.

Undoubtedly, Baltagi is one of the key figures in this case. His actions, inactions and interactions with Adkins and Abington play a pivotal role in Abington's claims. Indeed, his execution of the Warehouse Documents was, according to Abington, the reason Abington disbursed the loan proceeds. Thus, this aspect counsels towards finding the adverse influence trustworthy.

To summarize, three of the four *LiButti* factors indicate that adverse inferences are inappropriate. Hence, in considering the *LiButti* factors to gauge the trustworthiness of the inference as well as the type and specificity of the questions Baltagi asserted his privilege against, the Court finds that applying adverse inferences for summary judgment analysis is improper. This aspect of Abington's Motion *in Limine* for an Adverse Inference (ECF No. 340) is **DENIED**.

### 3. Jury Trial

As noted, Abington also seeks to impose an adverse inference at the jury trial that may take place. (ECF No. 340 at 17.) While highly likely, it is currently unknown as to whether any party will subpoena Baltagi to testify at trial. If they do, it is unknown whether Baltagi will chose to answer questions or to invoke the Fifth Amendment as to all or some inquiries.  For these reasons, this request is **DENIED** as premature. *Id*.

In sum, Abington's Motion for an Adverse Inference (ECF Nos. 335, 340) is **DENIED**.

Having determined all preliminary matters, the Court now addresses XPO's Motion for Summary Judgment.

## III.   MOTION FOR SUMMARY JUDGMENT

### A.  Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Walton v. Ford Motor Co*., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc*., 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc*., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

## B. Analysis

XPO moves for summary judgment on all of Abington's claims against it. As such, an analysis of Abington's fraud, federal and state RICO, civil conspiracy and breach of contract counts follows.

### 1. Count Three: Fraud

In Count Three, Abington seeks to hold XPO vicariously liable for Baltagi's alleged fraud. (ECF No. 205 at ¶ ¶ 86-91.) The Court begins by addressing a choice of law question before turning to the parties' substantive arguments.

#### a. Choice of Law

Because the Loan Agreement, Security Agreement, and Promissory Note specify that California law applies, Abington seeks a ruling that California law applies to its fraud claims in

Count One against Adkins and in Count Three against Baltagi and XPO. (ECF Nos. 334 at 3, 18 and 205 at ¶¶ 72-78, 86-91.) Abington also asks the Court to apply California law to the related respondeat superior analysis. (ECF No. 334 at 3.) XPO argues that Abington fails to identify conflict between Ohio and California law such that the choice of law analysis is unnecessary. (ECF No. 361.) Alternatively, XPO asserts that Ohio law governs both issues. *Id.*

Preliminarily, the Court notes that there is no motion for judgment pending against Adkins. Because the Court does not issue advisory opinions, the Court's present determination on the choice of law question is limited in applicability to Count Three, Abington's fraud claims versus XPO and Baltagi. After due review, the Court decides that Ohio law is properly applied to that Count.

Ohio requires the presence of conflict before engaging in any choice of law analysis. *Akro-Plastics v. Drake Indus.*, 685 N.E.2d 246, 248 (11th Dist. 1996). "If the two states would use the same rule of law or would otherwise reach the same result, it is unnecessary to make a choice of law determination because there is no conflict of law." *Mecanique C.N.C., Inc. v. Durr Envtl., Inc.*, 304 F. Supp. 2d 971, 975 (S.D. Ohio 2004) (Marbley, J.). Here, Abington, as the party seeking application of the law of a foreign jurisdiction, bears the burden of establishing conflict. *Id.* Should it fail to sustain its burden, Ohio law applies. *Gouge v. BAX Global, Inc.*, 252 F. Supp. 2d 509, 521 (N.D. Ohio 2003)(citation omitted).

Abington satisfies its charge. Specifically, Abington identifies key differences in damages—Ohio has a punitive damages cap, California does not; liability—Ohio requires an employee to act for the employer's benefit in order for respondeat superior liability to attach, California does not; and burden of proof—Ohio requires plaintiffs to prove that they investigated before reliance will be determined justifiable, California does not. (ECF No. 365 at 138.) XPO

does not address these contentions. (ECF Nos. 361 at 6-7 and 374 at 11.)  The Court holds that the noted differences are material, as they deal with three key issues in any case—damages, liability and burden of proof. As such, Abington has satisfied its burden and the Court proceeds to outline the analytical parameters for Abington's request.

Abington urges the Court to apply California law. XPO insists Ohio or Texas law should apply. XPO further argues that the Court should apply Ohio law because there is no material difference between Ohio or Texas law for fraud. Abington fails to dispute this latter contention; thus, the Court treats the question before it as whether California or Ohio law should apply to the noted claim.

This is a diversity case. Consequently, "the law of the forum state, including the forum state's choice-of-law rules, apply." *Burns v. Taurus Int'l Mfg*., 826 F. App'x 496, 499 (6th Cir. 2020). Ohio adheres to the Restatement (Second) of Conflicts for choice of law questions. *Morgan v. Biro Mfg. Co*., 15 Ohio St. 3d 339, 342 (1984). To that end, "the court must apply the Restatement analysis." *Charash v. Oberlin Coll*., 14 F.3d 291, 296 (6th Cir. 1994). The key issue is "which state has the most significant relationship to the occurrence and the parties." *In re Nat'l Century Fin. Enters*., 846 F. Supp. 2d 828, 851 (S.D. Ohio 2012) (Graham, J.).

Three sections guide that determination. First, "the inquiry is which state 'has the most significant relationship to the occurrence and the parties under the principles stated in § 6.'" *Id*. at 850-51 (quoting § 145(1)). Second, Restatement (Second) of Conflict of Laws §145(2) (1971) contains the contacts to be considered in this regard. *Id*. Third, for claims of fraud and misrepresentation when "plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made," the Court considers Restatement (Second) of Conflict of Laws § 148(2) (1971). "In evaluating the applicable Restatement

provisions, courts typically start with the most particularized section—here, § 148 on fraud and misrepresentation—and then turn to the more general guidance in § 145 and the cornerstone principles of § 6." *In re Nat'l Century Fin. Enters*., <u>846 F. Supp. at 850-51</u> (citations omitted).

### i.    Section 148(2)

The following contacts are considered when determining which state has the most significant relationship to the occurrence and the parties:

 (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

*Id.* (quoting Restatement (Second) of Conflict of Laws § 148(2) (1971)). The Court takes the § 148 factors out of order for ease of analysis.

*The domicil, residence, nationality, place of incorporation and place of business of the parties—§ 148(2)(d).* Abington conducts business from California. XPO Logistics is a Delaware corporation with its principal place of business in Connecticut. While XPO Global is a Delaware corporation with its principal place of business in Illinois, XPO Global maintained a place of business in Houston, and the case centers upon XPO Global's Houston location.

Mid America is an Ohio corporation with its principal place of business in Ohio. Adkins and Wilkin are Ohio residents. Eckerd and Baltagi are Texas residents. Because the overwhelming majority of the parties are located in Ohio or Texas, this factor favors application of Ohio law.

*The place where the defendants made the representations—§148(2)(c).* Adkins's phone calls and e-mails to Abington about the Landash deal came from Ohio. Wilkin's contacts with Abington also originated from Ohio. Eckerd's and Baltagi's communications with Abington both originated in Texas. Additionally, Adkins, Wilkin, Eckerd, Watson and Baltagi met with Shokoufanedh and Urtel at the Houston location to personally discuss the deal and to view the tires' storage area. All communications therefore originated from Ohio or Texas. This factor weighs in favor of applying Ohio law.

*The place where the plaintiff received the representations—§ 148(2)(b).* Abington received the e-mail and telephone communications in California. But Abington also received representations in Texas during Urtel's and Shokoufandeh's visit to the Houston location. Hence, this factor is neutral.

*The place where the tangible thing which is the subject of the transaction between the parties was situated at the time—§ 148(2)(e).* Adkins and Baltagi told Abington that the tires were being shipped from California. In actuality, they were already in Texas. (ECF Nos. 268-17 and 265-37.) In this instance, Comment i to § 148 is instructive. It provides that when "the subject of the transaction between the parties is a tangible thing, the place where the thing is situated at the time of the transaction is a contact of some importance provided, at least, that both parties were aware that the thing was situated in this place at that time." Here, both parties were not aware that the tires were in Texas at the time of the Landash transaction. But Abington

expected the tires to be stored in Texas for some time. Thus, this factor, of negligible importance, leans towards applying Ohio law.

*The place where plaintiff acted in reliance upon the defendants' representations—§ 148(2)(a)*. Abington executed the relevant documents and disbursed the loan proceeds in California. XPO argues that does not matter. Instead, XPO argues that Texas is the place were Abington received and relied on the alleged misrepresentations. That may well be. But the inquiry is where Plaintiff acted, and that is California. This factor tips towards the application of California law.

*The place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant—§ 148(2)(f)*. Abington disbursed the loan proceeds from California.

In sum, the § 148(2) analysis has three factors favoring Ohio law and two factors favoring California law. The Court now examines § 145(2).

### ii.    Section 145(2)

Abington fails to partake in this aspect of the analysis but XPO does address this section. Relevant contacts under § 145(2) include: (1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship, if any, between the parties is centered. Restatement § 145(2).

*The place where the injury occurred—§ 145(2)(a)*. Abington disbursed the loan proceeds from California, so this factor favors application of that state's law.

*The place where the conduct causing the injury occurred—§ 145(2)(b)*. All communications originated from Ohio or Texas. This factor favors application of Ohio law.

*The domicil, residence, nationality, place of incorporation and place of business of the parties—§ 145(2)(c).* For the reasons stated in the § 148(2)(d) analysis, this element favors application of Ohio law.

*The place where the relationship, if any, between the parties is centered—§ 145(2)(d).* For this portion of the analysis, the Court agrees with XPO that Texas is the place the parties' relationship is centered because that is where all parties physically met and is where the tires were stored. This factor favors Ohio law.

The majority of the § 145(2) factors therefore counsel toward application of Ohio law.

### iii.  Section 6(2)

Abington bypasses analysis of this "cornerstone" section as well. XPO engages in a discussion of this section, and its efforts prove fruitful. Factors addressed under this section include:

>    (a) the needs of the interstate and international systems,
>    (b) the relevant policies of the forum,
>    (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>    (d) the protection of justified expectations,
>    (e) the basic policies underlying the particular field of law,
>    (f) certainty, predictability, and uniformity of result, and
>    (g) ease in determination and application of the law to be applied.

Restatement (Second) of Conflicts of Laws § 6(2).

*The needs of the interstate and international systems—§ 6(2)(a).* The "most important function of choice-of-law rules is to make the interstate and international systems work well." Restatement (Second) of Conflict of Laws § 6(2) cmt. d (1971). Key to this purpose are certainty, predictability and uniformity of result. Because the majority of factors from § 148(2) and § 145(2) favor Ohio law, this aspect leans towards application of that state's law.

54

*The relevant policies of the forum—§ 6(2)(b).* Under this factor, the Court looks to Ohio's interest in preventing fraud. The law of fraud's "purpose is the reduction of dishonesty in human interactions." *Hosley v. Exterior Portfolio, LLC,* No. 11CVH-5949, 2012 Ohio Misc. LEXIS 1091, at *21 (Ct. Com. Pl. Aug. 23, 2012). Because the alleged misrepresentations were made in Ohio and Texas, this factor counsels towards applying Ohio law.

*The relevant policies of other interested states and the relative interests of those states in the determination of the particular issue—§ 6(2)(c).* In California, like Ohio, the tort of fraud is designed to protect its citizens from fraud and deception. *See Hunter v. Up-Right, Inc.*, 6 Cal. 4th 1174, 1192 (1993). Because the purpose of fraud liability is the same in Ohio and California, and because the misrepresentations occurred in Ohio and Texas, this factor intones application of Ohio law is proper.

*The protection of justified expectations—§ 6(2)(d).* The loan documents specify application of California law. Yet, Abington filed this case in Ohio against Ohio defendants and asserted Ohio state law claims. Additionally, Abington conducts business nationwide; thus, it should "reasonably expect to face the laws of another jurisdiction from time to time." (ECF No. 361 at 16.) However, XPO was not a party to the loan documents; having never seen those papers, XPO did not expect California law to be applied in this case. This factor counsels toward application of Ohio law.

*The basic policies underlying the particular field of law—§ 6(2)(e).* As noted above, the tort of fraud is designed to prevent dishonesty. Because the misrepresentations were made in Ohio and Texas, this element counsels toward application of Ohio law.

*The certainty, predictability and uniformity of result—§ 6(2)(f).* Applying Ohio law would yield certainty, predictability and uniformity of result because there are two other cases

pending before the undersigned involving the same facts, similar claims, and similar or related defendants. *See Great Southland Limited v. Landash Corporation,* No. 17cv-143 and *Kirby Developments, LLC v. XPO Global Forwarding, Inc., et al.*, No. 18cv-500. In addition, Abington seeks application of California law only as to its fraud claim. That leaves Ohio law for Abington's civil conspiracy and contract claims. Application of two state's laws in a single case could produce inconsistent results. Consequently, this factor directs that application of Ohio law is proper.

*The ease in the determination and application of the law to be applied—§ 6(2)(g).* This factor is neutral. While the Court routinely applies Ohio law, it also commonly applies the laws of other forums in diversity matters.

The Court's § 6(2) discussion establishes that applying Ohio law is appropriate.

### iv. Ohio Law Applies

To summarize, analysis of § § 148(2), 145(2) and 6(2) of the Restatement (Second) of Conflict of Laws (1971) establish that the majority of factors direct application of Ohio law to Abington's fraud claim. "[A]ny rule of choice of law, like any other common law rule, represents an accommodation of conflicting values." Restatement (Second) of Conflict of Laws § 6 cmt. i (1971). The Court's thorough review of the noted sections reveals that Ohio and Texas have the most significant relationship to the present matter. Ohio law will therefore apply to Count Three. Abington's Motion for Partial Summary Judgment: California Law Applies to the Common Law Fraud Claims (ECF No. 334) is **DENIED**.

### b. Summary Judgment is Denied for Count Three.

Abington's fraud count is based on Baltagi's execution of the Warehouse Documents. (ECF No. 205 at ¶ ¶ 86-91.) Abington alleges that Baltagi knowingly completed the documents

with false material statements on which it justifiably relied on when releasing the loan proceeds. *Id*. Abington alleges it suffered $1,523,000 in damages and also seeks punitive damages. Abington asserts XPO, as Baltagi's employer at the time of the Landash deal, is liable for his actions under respondeat superior.

XPO, applying Ohio law, argues that judgment on this count in its favor is proper because Abington cannot show its reliance on Baltagi's representations was justified. (ECF No. 338 at 9.) XPO alternatively maintains that it cannot be held vicariously liable for Baltagi's actions because he lacked authority to sign the Warehouse Documents. *Id*. at 10. In response, Abington defends Count Three under California law which is of no import here. (ECF No. 365 at 138, 150-84.) That fact alone does not render judgment on Count Three in XPO's favor proper. Instead, the Court still must ensure that XPO has satisfied its Rule 56 burden. *Delphi Automotive Sys., LLC v. United Plastics, Inc*., 418 F.App'x 374, 381 (6th Cir. 2011). The Court determines that XPO has not done so.

Under Ohio law, the elements for the tort of fraudulent inducement are: 1) a representation made, 2) material to the transaction, 3) which is false, with knowledge or with utter disregard and recklessness as its falsity, 4) with intent to mislead, 5) justifiably relied upon, and 6) a resulting injury. Countrymark Coop. v. Smith, 124 Ohio App. 3d 159, 171-72 (3rd Dist. 1997) (citing Burr v. Board of County Comm'rs. (1986), 23 Ohio St. 3d 69, 491 N.E.2d 1101)).

### i. Justifiable Reliance

XPO's first basis for judgment focuses on justifiable reliance, the "penultimate element." *Euclid Bus. Park, LLC v. Peters*, Cuyahoga Co. Ct. Cmn. Pleas No. CV 06 589304, 2013 Ohio Misc. LEXIS 71, at *26. "Reliance is that degree of care which would be exercised in an average transaction between persons under similar circumstances. . . ." *Freedom Foods, Inc. v. Rose*

*Valley Land Group, Ltd.*, No. 1:04cv-690, 2006 U.S. Dist. LEXIS 49591, *14-15 (S.D. Ohio July

20, 2006) (Weber, J.) (quotation and citation omitted). "Justifiable reliance is a standard that falls

somewhere between actual reliance and reasonable reliance." *Peters*, No. CV 2013 Ohio Misc.

LEXIS 71, at *26. "Reliance is justifiable if the representation does not appear unreasonable on

its face and if, under the circumstances, there is no apparent reason to doubt the veracity of the

representation." *Ownerland Realty, Inc. v. Zhang*, 12th Dist. Warren Nos. CA2013-09-77 and

CA2013-10-97, 2014-Ohio-2585, ¶ 19 (citation omitted). The question of justifiable reliance is

one of fact. *Loan v. Fifth Third Bank*, No. 1:09-cv-930, 2011 U.S. Dist. LEXIS 170537, at *23

(S.D. Ohio Apr. 14, 2011) (Barrett, J.).

"Ohio law requires a person to exercise proper vigilance in dealing with others and, at

times, to reasonably investigate before relying on statements or representations." *Harrel v. Solt*,

4th Dist. Pickaway No. 00CA27, 2000-Ohio-1964, *26. "Such vigilance imputes a duty upon

one to reasonably investigate the truth of representations made prior to reliance thereon."

*Dito v. Wozniak*, 9th Dist. Lorain No. 04CA-8499, 2005-Ohio-7, ¶ 18.

XPO asserts that Abington did not reasonably investigate Baltagi's representations such

that its reliance on those statements was not justified. In particular, XPO points to Abington's

failure to: (1) perform a background check on Adkins, (2) secure an appraisal for the tires, (3)

verify the information Adkins provided, and (4) follow its internal underwriting checklist. (ECF

No. 338 at 45-47.) Dr. Kan, XPO's lending expert, opined that Abington failed to reasonably

investigate the statements.[8] (ECF No. 338-4 at 8.) However, McGarvey, Abington's due

diligence expert, opined that Abington's investigation was sufficient. Because whether reliance

is justified is a question of material fact and because the noted experts disagree on whether

---

[8] Without moving to exclude Kan's opinion, Abington attempts to discredit it on issues
related to credibility. (ECF No. 365 at 172.) Credibility is for the jury.

Abington's investigation was reasonable, the Court **DENIES** XPO's Motion for Summary

Judgment on Count Three based upon justifiable reliance.

### ii. Vicarious Liability / Respondeat Superior

Next, XPO argues that even if Abington justifiably relied upon Baltagi's representations,

XPO cannot be held liable because Abington cannot establish any of the three possible scenarios

for imposing vicarious liability on XPO. (ECF No. 338 at 50.)  The Court determines that

summary judgment is not proper.

"It is a fundamental maxim of law that a person cannot be held liable, other than

derivatively, for another's negligence. In an employment setting such as is before this court

today, the most common form of derivative or vicarious liability is that imposed by the law of

agency, through the doctrine of respondeat superior." *Albain v. Flower Hosp.*, 50 Ohio St. 3d

251, 254-55 (1990). Under this doctrine "[g]enerally, an employer or principal is vicariously

liable for the torts of its employees or agents . . . ." *Nat'l Union Fire Ins. Co. v. Wuerth*, 122

Ohio St. 3d 594, 599 (2009). The application of respondeat superior "depends on the existence of

control by a principal (or master) over an agent (or servant), terms that we have used

interchangeably." *Id.* (citation omitted.)

XPO may be found vicariously liable for Baltagi's actions in three alternative situations.

First, if he was acting within the course and scope of his employment when making the alleged

misrepresentations. *Groob v. KeyBank*, 108 Ohio St. 3d 348, 355 (2005). Second, if XPO took

some action indicating Baltagi had apparent authority for the misconduct. *Id.* at 358. Third, if

XPO ratified his conduct. *Smith v. Bridal*, 11th Dist. Trumbull No. 2009-T-14, 2009-Ohio-6520,

¶ 20.

### iii. Course and Scope of Employment

"While an intentional tort is generally outside the scope of employment, an employer is held liable under respondeat superior if the conduct giving rise to the tort is calculated to facilitate or promote the business for which the servant is employed." *Callen v. Int'l Bhd. of Teamsters, Local 100*, 144 Ohio App. 3d 575 (2001) (quotation and citation omitted). But "an employer is not liable for independent self-serving acts of his employees which in no way facilitate or promote his business." *Byrd v. Faber*, 57 Ohio St. 3d 56, 59 (1991).

The Court turns to the Restatement (Second) of Agency § 228 (1957) for the factors to determine whether Baltagi's actions were within the course and scope of his employment. *See Hale v. Spitzer Dodge, Inc.*, 10th Dist. Franklin No. 04AP-1379, 2006-Ohio-3309, ¶ 20. Pursuant to that section:

> (1)  Conduct of a servant is within the scope of employment if, but only if:
>   (a)  it is of the kind he is employed to perform;
>   (b)  it occurs substantially within the authorized time and space limits;
>   (c)  it is actuated, at least in part, by a purpose to serve the master, and
>   (d)  if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
> (2)  Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Typically, scope of employment is a question of fact. *Osborne v. Lyles*, 63 Ohio St.3d 326, 330 (1992). However, the "'scope of employment becomes a question of law'" when "'reasonable minds can come to but one conclusion . . . regarding scope of employment.'" *Carter v. Gerbec*, 9th Dist. Summit No. 27712, 2016-Ohio-4666, ¶ 25 (quoting *Osborne*, 63 Ohio St. 3d at 330).

Section 228(1)(a) concentrates on whether the conduct is of a kind the employee is employed to perform. In this regard, Abington alleges that Baltagi's tortious acts included

fraudulently confirming inventory and executing and transmitting the Warehouse Documents. (ECF No. 365 at 173.) XPO argues that Baltagi took those alleged actions outside the course and scope of employment. In support, XPO asserts that its Houston location was not a warehouse, so it would never authorize Baltagi to confirm inventory, opine on inventory condition or complete the Warehouse Documents. (ECF No. 267-1 at 43, 58). In response, Abington points to conflicting testimony indicating that Baltagi did have authority to do those things. (ECF Nos. 267-2 at 292 and 316-1 at 181-82.) Thus, genuine issues of material fact exist as to whether Baltagi's conduct was of a kind he was authorized to perform.

XPO does not address § 228(1)(b), focusing on temporal and special concerns, and the Court will not make arguments for XPO on this point.

As to § 228(1)(c), the Court asks whether Baltagi's conduct was "actuated, at least in part, by a purpose to serve" XPO. XPO argues the answer to that query is negative because Baltagi's conduct in no way benefitted XPO. (ECF No. 338 at 53.) But a jury could find differently, as XPO collected almost $160,000 in storage fees from Adkins and Landash after the Landash deal was made. (ECF No. 365 at 121-2.) XPO may not have had that business were it not for Baltagi's dealings with Adkins and Abington. Moreover, intent is typically a jury question. *Brulport v. Coopervision, Inc*., No. 92-3165, 1992 U.S. App. LEXIS 30496, at *9, 979 F.2d 850 (6th Cir. Nov. 10, 1992) (table).

Lastly, § 228(1)(d) is irrelevant to the analysis because XPO does not allege that Baltagi used force against others.

The Court concludes that genuine issues of material fact include, but are not limited to, whether Baltagi's conduct was within the course and scope of his employment and as to whether

his actions benefitted XPO. XPO's Motion for Summary Judgment on Count Three based on course and scope of employment is **DENIED**. (ECF No. 338.)

#### iv. Apparent Authority

Next, XPO argues that Abington cannot establish liability on the basis of apparent authority. (ECF No. 338 at 53.) "For the principal to be liable, the principal's acts must be found to have clothed the agent with apparent authority." *Groob*, 2006-Ohio-1189, ¶ 56 (citation omitted). An apparent-authority analysis focuses on the acts of the principal, not the agent. *Master Consol. Corp. v. BancOhio Natl. Bank*, 61 Ohio St. 3d 570, 576-577, 575 N.E.2d 817 (1991). For apparent authority liability to attach, the Supreme Court of Ohio directs that the evidence must affirmatively show that the: "(1) principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) person dealing with the agent knew of those facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority." *Id.* at syllabus.

Beginning with the former, XPO argues that it did nothing to hold Baltagi out as a warehouse manager or to indicate that Baltagi had authority to sign the Warehouse Documents and to confirm the tires' condition. (ECF No. 338 at 53-54.) Abington responds that XPO made Baltagi the branch manager at the Houston location. "By giving an agent a title suggestive of certain authority, the principal holds an agent out as having authority in the nature of the responsibilities commensurate with that title." *Delorean Cadillac v. Weaver*, No. 8th Dist. Cuyahoga No. 71827, 1997 Ohio App. LEXIS 4533, at *10 (Oct. 2, 1997) (citation omitted). Abington also asserts that XPO gave Baltagi authority to negotiate customer contracts and to manage all activities in Huston. (ECF No. 365 at 189) (citing ECF Nos. 267-2 at 292 and 316-1

at 181-2). Abington thus argues that XPO, via the title and authority it gave to Baltagi, held Baltagi out to the public as possessing sufficient authority to execute the Warehouse Documents and to certify the condition of the tires. To illustrate, Abington refers to a sample warehouse receipt that a XPO Houston employee (not Baltagi) e-mailed to Shokoufandeh for the Landash deal. (ECF No. 341-44.) This, Abington argues, indicates that XPO did operate a warehouse in Houston that Baltagi was the manager for. Abington also contends that XPO knew or should have known goods were warehoused in Houston because Baltagi copied other XPO employees on e-mails about the tires and had other Houston employees contact Adkins for storage fees. Further, XPO received income from those fees. (ECF Nos. 341-44 and 342 at 176-80.)  Under these circumstances, the Court determines that summary judgment is inappropriate as to the first factor.

The latter consideration examines whether Abington knew that XPO made Baltagi Houston's manager and whether Abington acted in good faith when believing that Baltagi possessed the necessary authority to authorize tire storage.  To these points, Shokoufandeh and Urtel knew Baltagi was the manager of the Houston location. Additionally, Shokoufandeh and Urtel visited Houston and saw tires stored there. Shokoufandeh's and Urtel's knowledge of Baltagi's title, combined with their knowledge of Houston's open storage of tires, could indicate that Baltagi had authority to authorize tire storage. While XPO contends that Abington knew that Adkins created the warehouse documents because he e-mailed them himself as Word documents to Abington, XPO cites to nothing in the record confirming those allegations. And, another XPO Houston employee sent Shokoufandeh a sample warehouse receipt. Shokoufandeh's knowledge of  that e-mail could indicate to him that more than one XPO Houston worker was facilitating tire storage. That knowledge could also serve to affirm Baltagi's authority to authorize tire

storage and to execute the Warehouse Documents in Shokoufandeh's eyes. Accordingly, the

Court cannot find as a matter of law that Abington did not act in good faith when apparently

believing that Baltagi had the requisite authority to make the representations at issue.

XPO's Motion for Summary Judgment on Count Three based on apparent authority is

**DENIED**. (ECF No. 338.)

### v. Ratification

XPO next argues that it did not ratify Baltagi's behavior because it did not know about

his actions. (ECF No. 338 at 54.) Abington argues that XPO (1) should have known what Baltagi

was doing and (2) impliedly ratified Baltagi's actions by retaining the storage fees such that XPO

cannot escape liability by ratification. (ECF No. 365 at 193-195.)

"A principal ratifies the unauthorized act of his agent if the 'principal, with full

knowledge of the facts, conducts himself in a way which manifests his intention to approve an

earlier act performed by his agent which did not bind him.'" *Bailey v. Midwestern Ent., Inc*., 103

Ohio App.3d 181, 185 (10th Dist. 1995) (quoting *Karat Gold Imports, Inc. v. United Parcel*

*Serv., Inc*., 62 Ohio App.3d 604, 611 (8th Dist.1989)). Knowledge need not be actual; the

knowledge component of ratification also includes what the principal should have known. *Clear*

*Creek Pshp. v. LeBeau*, 10th Dist. Nos. 97APE04-568 and 97APE04-569, 1998 Ohio App.

LEXIS 1890, at *15-16 (Apr. 28, 1998). In addition, "[r]atification by the principal can be

demonstrated by the retention of the benefits of the transaction." *Chevrolet v. Calhoun*, 10th

Dist. No. 03AP-816, 2004-Ohio-1006, ¶ 19. With retention of the benefit comes retention of

liability. *Rambacher v. Staton*, 4th Dist. Lawrence No. 1335, 1979 Ohio App. LEXIS 11157, at

*5 (Oct. 12, 1979) (citation omitted).

Whether ratification occurred is usually a question of fact. *See Bailey*, <u>103 Ohio App. 3d</u> <u>at 185</u>. The record here underscores the reason for that general rule. XPO argues Houston was not a warehouse facility. Yet, that location was openly storing tires and employees other than Baltagi were sending Abington sample warehouse receipts. Furthermore, XPO retained nearly $160,000 in storage fees from Adkins. These factors combine to create genuine issues of material fact that are not limited to whether XPO should have known what Baltagi was doing and to whether XPO ratified Baltagi's actions. Summary judgment on this portion of XPO's argument is **DENIED**.

### c. Punitive Damages

XPO's final argument in support of judgment in its favor on Count Three is that Abington is not entitled to punitive damages because XPO did not authorize, ratify or participate in Baltagi's alleged misconduct. (<u>ECF No. 338 at 56</u>.) Because the Court holds above that numerous genuine issues of material fact exist regarding the applicability of vicarious liability, the Court **DENIES** Abington's Motion for Summary Judgment on Count Three's request for punitive damages. (<u>ECF No. 338</u>.)

### 2. Counts Four and Five: Federal and State RICO

Abington asserts that XPO, through Baltagi, engaged in a pattern of racketeering in violation of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), <u>18</u> <u>U.S.C. § 1962(c)</u>, and Ohio's counterpart, the Ohio Corrupt Practices Act ("OCRA"), R.C. § 2923.32.[9] (<u>ECF No. 205</u> ¶ ¶ 92-107.) XPO urges the Court to enter judgment in its favor under both sections by arguing that it is not vicariously liable for Baltagi's actions under either statute. (<u>ECF No. 338 at 33</u>). XPO additionally argues that judgment must be granted on Abington's

---

[9] Abington brings the state count pursuant to R.C. § 2923.34, which establishes a private cause of action for violation of R.C. § 2923.32.

OCRA claim because Abington is unable to establish requisite predicate acts under that law. *Id*. Abington responds that because Baltagi committed the misdeeds within the course and scope of his employment and with the intent to benefit XPO that XPO is vicariously liable for his actions under the cited sections. (ECF No. 365 at 139-55.) As for the state count, Abington argues that it sufficiently plead a conspiracy liability theory such that the state RICO statute's predicate act requirement is satisfied. *Id*. at 162-164. Abington's arguments prevail.

Abington describes the alleged RICO conspiracy as follows: Adkins, his business entities, and Eckerd solicited lenders to provide financing for fraudulent tire transactions while maintaining and using their tire inventory as "bait" for the loans. (ECF No. 205 ¶ ¶ 93(a), 102(a)). Wilkin and Mid America acted like the "supplier" of the tires. *Id*. ¶ ¶ 93(b), 102(b). After a loan was disbursed to Mid America, it would transfer the proceeds, minus a broker fee, to Adkins. *Id*. XPO and Baltagi acted as the storage facility. *Id*. ¶ ¶ 93(c), 102(c). Because lenders would not disburse the loan until the tires were shipped to a warehouse facility, XPO, via Baltagi, "acted as an escrow agent for the tires . . . ." *Id*. As such, Abington describes the Defendants' alleged association-in-fact enterprise as "the scheme to defraud financing companies of loan proceeds through fabricated OTR tire transactions." *Id*. ¶ ¶ 104-5.

Abington alleges XPO committed wire fraud in violation of 18 U.S.C. § 1343 on March 16, 2015 when Baltagi e-mailed Abington the Inspection Report. *Id*. ¶ ¶ 96(a)(iii), 103(a)(iii). Abington asserts that this communication was sent "with the intent to deprive Abington of money" and "was in furtherance of the scheme or artifice to defraud Abington as the communication . . . falsely stated that Mid America shipped the tires to the XPO Houston Warehouse" to induce Abington to release the funds. *Id*.

Section 1962(c) makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."[10] Correspondingly, the OCPA provides "[n]o person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt." R.C. § 2923.32. "The OCPA statute is patterned after the federal RICO statute; therefore, courts apply federal case law to analyze claims under OCPA." *Cleveland Bakers & Teamsters Health & Welfare Fund v. Purdue Pharma L.P.* (*In re Nat'l Prescription Opiate Litig.*), 440 F. Supp. 3d 773, 2020 U.S. Dist. LEXIS 30360, *107 (N.D. Ohio 2020) (citing *U.S. Demolition & Contracting v. O'Rourke*, 94 Ohio App. 3d 75, 640 N.E.2d 235, 240 (8th Dist. 1994)).

The elements of a RICO claim are not in play here. Rather, the issue as framed by the parties is whether XPO can be held vicariously liable for Baltagi's actions under RICO and the OCPA. XPO argues in the negative for four reasons. First, because liability under such a circumstance is not available as a matter of law. (ECF No. 338 at 33.) Second, because Baltagi's alleged RICO violations were not within the course and scope of his employment. (ECF No. 374 at 2.) Third, because it did not receive a benefit from Baltagi's purported misconduct. Fourth, because it took no part in Baltagi's actions. The Court addresses each argument in order.

---

[10] 18 U.S.C. § 1984 provides a private right of action for "[a]ny person injured in his business or property by reason of a violation of" § 1962.

### a. RICO and OCRA – Vicarious Liability

### i.    RICO Allows Liability Here

Relying on case law from New York, XPO argues that the idea of a corporation being vicariously liable for an employee's "'independent fraudulent acts'" is "'startling'" because the intent of RICO "'was to protect corporations from criminal infiltration,'" not to "'make them the responsible parties.'" (ECF No. 338 at 34) (quoting *Banque Worms v. Luis A. Duque Pena E Hijos, Ltda*., 652 F. Supp. 770, 772 (S.D.N.Y. 1986)).  Asserting that courts are therefore "hostile" to imposing vicarious liability under RICO, XPO states that "there is no question that a mere employment relationship alone falls well short of imposing vicarious RICO liability on a company." (ECF No. 338 at 34.)

The Sixth Circuit does not share the New York's district courts' hesitancy in applying vicarious RICO liability under § 1962(c). Reading congressional intent differently, the Sixth Circuit found that "[s]uch a prohibition, if it existed, would prevent corporate persons from ever being found liable under RICO, since corporate principals may act only through their agents. Such a rule would be manifestly contrary to the intent of Congress, and we decline to adopt it." *Davis v. Mut. Life Ins. Co*., 6 F.3d 367, 379 (6th Cir. 1993). Accordingly, liability may be imposed upon "corporate 'persons' on account of the acts of their agents, particularly where the corporation benefitted by those acts" and the corporation is separate from the enterprise.[11] *Id*. at 379. Thus, vicarious liability is available here.

When does that liability attach? When the employees' criminal acts are done within the scope of their employment with the intent to benefit the corporation.  *Trollinger v. Tyson Foods,*

---

[11] XPO makes no argument regarding distinctness.

*Inc.*, No. 4:02-CV-23, 2007 WL 1091217, at *4 (E.D. Tenn. Apr. 10, 2007) (citing *Davis*, 6 F.3d at 379).

### ii.    Scope of Employment

XPO's primary arguments on this point mirror those analyzed in the fraud section above. For the same reasons the Court found them unpersuasive there, it finds them unpersuasive here.

XPO does advance a new argument in this context, though. That is, XPO asserts that Baltagi was not acting within the course and scope of his employment because he violated several of XPO's policies when engaging in the acts at issue. First, XPO had the Contracts Policy that required him to obtain management approval before signing the Warehouse Documents and sending the related e-mails to Abington. (ECF No. 338 at 39.) XPO states that Baltagi did not secure the requisite approval before sending the documents in violation of that policy. Second, XPO had a policy prohibiting dishonesty ("Dishonesty Policy"). XPO argues that Baltagi acted in a dishonest manner in violation of that policy by not alerting XPO of his actions with respect to Abington. Third, XPO had a policy prohibiting employees from engaging in fraudulent conduct ("Fraud Policy"). XPO asserts that Baltagi violated that policy through the Warehouse Documents and his interactions with Abington and the other individual defendants. Those polices and violations, XPO argues, insulate it from liability for Baltagi's actions.

The problem with that contention is that XPO offers no proof that Baltagi received, or was actually aware of, the Contracts, Dishonesty, and/or Fraud policies. XPO further fails to address the steps it took, if any, to enforce those policies. *United States v. Beusch*, 596 F.2d 871, 878 (9th Cir. 1979) ("Merely stating or publishing such instructions and policies without diligently enforcing them is not enough to place the acts of an employee who violates them

outside the scope of his employment."). Thus, XPO's scope of employment argument fails to support summary judgment on the federal and state RICO counts.

### iii. Benefit

For vicarious RICO liability to attach, XPO must have benefitted from the alleged RICO violations.  *Davis*, 6 F.3d at 379. XPO argues it received no benefit as a result of Baltagi's actions. Yet, the Court cannot determine this to be true as a matter of law because XPO received almost $160,000 in storage fees from Adkins and Landash. Hence, XPO's benefit argument supporting summary judgment on the federal and state RICO counts is unsuccessful.

### iv.  Action by XPO

XPO next argues that its lack of involvement in Baltagi's alleged fraud insulates it from vicarious liability.  (ECF No. 338 at 37-38.)  Put another way, XPO attempts to insert a third requirement for vicarious RICO liability to attach; that it must have been an *active* participant in the fraud. *Id*. In support, XPO references cases from foreign districts and circuits holding that a corporation must actively take part in a RICO violation for liability to attach for the unlawful acts of its employees. (ECF No. 338 at 37)(citing cases). Its citations are misplaced.

XPO first cites to *Holmes v. City of Racine*, 2014 U.S. Dist. LEXIS 154906 (E.D. Wis. October 31, 2014), wherein the court held "[t]o find a corporation liable [under RICO], the Court must find that the [corporation], *itself*, took some action." *Id*. *44 (emphasis in original). But *Holmes* did not involve allegations of an employee acting as a corporation's agent like the case *sub judice* does.

XPO also relies on *O'Brien v. Dean Witter Reynolds, Inc*., No. CIV 82-1605 PHX CLH, 1984 U.S. Dist. LEXIS 18239 (D. Ariz. Mar. 26, 1984) for its holding that "[c]ivil liability under RICO requires knowing or intentional participation and not mere negligence or recklessness."

*O'Brien*, 1984 U.S. Dist. LEXIS 18239, at *11 (quotation and citation omitted). Abington

properly counters that *O'Brien* did not address the issue of vicarious liability. *Holmes* and

*O'Brien* are therefore of no import.

In *Arvest Bank v. Rill*, No. CIV-07-417-FHS, 2008 U.S. Dist. LEXIS 30943, at *8 (E.D.

Okla. Apr. 14, 2008), the district court declined to impose vicarious RICO liability on a

corporate employer in part because that liability "is at odds with the intent and purpose of

RICO." *Id.* *9. Relying upon *D & S Auto Parts, Inc. v. Schwartz*, 838 F.2d 964, 967 (7th Cir.

1988), *Rill* stated that "[a]n employer who is not an active participant in the scheme to defraud

cannot be held accountable for its employees' racketeering activities because 'the statute [section

1962(c)] is designed to impose liability upon a corporation which is a perpetrator of illegal

activity . . . not upon an unwitting conduit of its employees' RICO violations.'" *Id.* *10 (quoting

*Schwartz*, 838 F.2d at 967). But *Rill* "involved a corporation indistinguishable from the alleged

RICO enterprise that neither benefited from nor participated in the criminal scheme." *Davis*, 6

F.3d at 379. Here, there is no distinctness issue and XPO benefitted from the scheme—at a

minimum through the collection of storage fees. And, the Sixth Circuit has held in *Davis* that the

statute does allow for vicarious RICO liability. *Davis*, 6 F.3d at 379-80. Hence, *Rill* does not aid

XPO's argument.

*Davis* discounts XPO's mention of *SK Hand Tool Corporation v. Dresser Industries,*

*Inc.*, 852 F.2d 936, 941 (7th Cir. 1988), cert. denied, 492 U.S. 918, 106 L. Ed. 2d 589, 109 S. Ct.

3241 (1989). Relying upon *Schwartz*, *Dresser* held that a corporate defendant, as an "unwilling

conduit," "cannot be held vicariously liable under RICO for the independent acts of its

employees." *Dresser*, 852 F.2d at 941 (citing *Schwartz*, 838 F.2d at 968). But the Sixth Circuit

addressed and disposed of both *Dresser* and *Schwartz* in *Davis* while holding that vicarious

RICO liability was available. *Dresser* thus fails to support XPO's argument.

In sum, the noted cases are either distinguishable from or overlook controlling Sixth

Circuit case law. XPO's Motion for Summary Judgment on the federal and state RICO claims

based upon active involvement is **DENIED**. (ECF No. 338.)

### b. OCPA - Predicate Acts

A claim under the OCPA, like RICO, is dependent upon a defendant committing two or

more predicate offenses. *State v. Miranda*, 138 Ohio St. 3d 184, 2014-Ohio-451, ¶ 13. The

OCPA differs from RICO in that the OCPA requires the alleged pattern or corrupt activity to

include at least one predicate act that is not wire fraud. *Bradley v. Miller*, 96 F. Supp. 3d 753,

774 (S.D. Ohio 2015) (citation omitted). XPO therefore contends that the Court must dismiss

Abington's OCPA claim because Abington failed to plead a predicate act other than wire fraud.

(ECF No. 338 at 41.) Abington responds that it satisfied the prerequisite by asserting conspiracy

and by asserting that Adkins engaged in money laundering. (ECF No. 365 at 163)(citing ECF

No. 205 ¶¶ 102, 105.) These allegations, Abington maintains, satisfy the OCPA's predicate act

requirement.

Abington is correct. R.C. 2923.34(A) relevantly authorizes a civil claim for relief against

any person who *conspires* to violate § 2923.32 and this District recognizes such a claim.

*Unencumbered Assets Tr. v. JP Morgan Chase Bank* (*In re Nat'l Century Fin. Enters.*), 604 F.

Supp. 2d 1128, 1157 (S.D. Ohio 2009) (Graham, J.).

> The partners in the criminal plan must agree to pursue the same
> criminal objective and may divide up the work, yet each is
> responsible for the acts of each other. *See Pinkerton v. United*
> *States*, 328 U.S. 640, 646, 66 S.Ct. 1180, 1183-1184, 90 L.Ed.
> 1489 (1946) ("And so long as the partnership in crime continues,
> the partners act for each other in carrying it forward"). If

> conspirators have a plan which calls for some conspirators to
> perpetrate the crime and others to provide support, the supporters
> are as guilty as the perpetrators. As Justice Holmes observed:
> "[P]lainly a person may conspire for the commission of a crime by
> a third person." *United States v. Holte*, 236 U.S. 140, 144, 35 S.Ct.
> 271, 272, 59 L.Ed. 504 (1915). A person, moreover, may be liable
> for conspiracy even though he was incapable of committing the
> substantive offense. *United States v. Rabinowich*, 238 U.S. 78, 86,
> 35 S.Ct. 682, 684, 59 L.Ed. 1211 (1915).

*Id.* (quoting *Salinas v. United States*, 522 U.S. 52, 63-64 (1997)).

The Fourth Amended Complaint alleges that Adkins, Wilkin, Eckerd, Mid America,

Baltagi and XPO via Baltagi conspired to violate RICO and the OCPA. XPO admits that Baltagi

aided in that fraud. (ECF No. 338 at 2.) Abington further alleges that Adkins, as a partner in the

conspiracy, committed money laundering. (ECF No. 205 at ¶ 103(b)). Adkins has plead guilty to

that crime. *See* 2:19cr-82(1). Money laundering is a qualifying predicate offense. *See* R.C. § §

2923.34(A) and 2923.31(I)(1).

Because Abington asserts a conspiracy count that XPO may be liable for under *Salinas*,

and because Abington alleges that Adkins engaged in money laundering, Abington has satisfied

R.C. § 2923.34(A)'s requirement of alleging at least two predicate offenses, at least one of which

is not wire fraud.

XPO's Motion for Summary Judgment on Counts Four and Five is **DENIED** in its

entirety. (ECF No. 338.)

### 3.      Count Six: Civil Conspiracy

"A civil conspiracy claim requires an underlying tortious act that causes an injury. Thus,

if there is no underlying tortious act, there is no actionable civil conspiracy claim." *Doane v.*

*Givaudan Flavors Corp.*, 184 Ohio App. 3d 26, 2009-Ohio-4989, ¶ 32 (1st Dist.). For XPO to

achieve summary judgment on this count, its motion for summary judgment on the fraud count

had to be successful. It was not. Hence, XPO's Motion for Summary Judgment on Abington's Civil Conspiracy count is **DENIED**. (ECF No. 338 at 56.)

### 4.       Count Eight: Breach of Contract

Finally, Abington asserts that the Security Letter constituted a contract between it and XPO that prevented XPO from releasing the tires without Abington's express written consent. (ECF No. 205 ¶ ¶ 123-27.) Abington asserts that XPO breached the Warehouse Security Interest Letter by disposing of one of the tires without Abington's written permission. *Id*.

For breach to occur, there must be a contract. *Hillier v. Fifth Third Bank*, 2020-Ohio-3679, ¶ 24, 154 N.E.3d 1266, 1272 (Ct. App.) (listing breach of contract elements to include "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff.") (quotation and citation omitted). XPO argues that judgment in its favor on this count is warranted "because Baltagi lacked the authority to sign" the Warehouse Security Interest Letter so no contract existed between XPO and Abington. (ECF No. 338 at 51.) This argument fails, as the Court finds genuine issues of material fact present on the authority issue, *supra* at § III(B)(b).

XPO alternatively contends that even if there was a contract, Abington could not demonstrate breach because the tires "were held in Houston until they were sold off in an auction ordered by the Bankruptcy court" in a related bankruptcy adversary proceeding. *Id*. at 57. From the present record, however, the Court cannot discern whether the specific tire at issue was sold pursuant to the Bankruptcy order or disposed of in another manner without Abington's consent. Thus, this argument is overruled.

Accordingly, XPO's Motion for Summary Judgment on Abington's breach of contract claim is **DENIED**. (ECF No. 338.)

## IV.    CONCLUSION

Numerous genuine issues of material fact, not all of which are listed herein, permeate the record. Hence, XPO's Motion for Summary Judgment (ECF Nos. 332, 338) is **DENIED**.

XPO's Motion to Exclude Expert Testimony of Evan Armstrong (ECF No. 330, 339) is **GRANTED** in part and **DENIED** in part.

XPO's Motion to Exclude Expert Testimony of John T. McGarvey (ECF No. 331) is **DENIED**.

Abington's Motion for Partial Summary Judgment: California Law Applies to the Common Law Fraud Claims (ECF No. 334) is **DENIED**.

Abington's First Motion *in Limine*: Abington is Entitled to an Adverse Inference Based on Defendant Afif Baltagi's Invocation of the Fifth Amendment Right Against Self-Incrimination During his Deposition (ECF Nos. 335, 340) is **DENIED**.

Abington's MOTION to Strike *Declaration of Corporate Representative* (ECF  No. 364) is **GRANTED** in part and **DENIED** in part.

XPO's Motion for Leave to File Instanter (ECF No. 372) is **GRANTED**.

A dispute exists as to whether Defendant XPO Logistics, Inc. is a proper party to this action. Thus, XPO is **ORDERED** to file an appropriate motion on this topic within ten (10) days of this Opinion and Order. Abington's opposition, if any, shall be filed within seven (7) days thereafter. Each filing is limited to five pages. Briefs that are late or in violation of the stated page limitation may be struck from the record *sua sponte*. Failure to file an appropriate motion will result in XPO Logistics, Inc. remaining as a proper party in this action.

This Opinion & Order is being filed under seal in the first instance. Counsel shall confer and submit an agreed redacted version of this Opinion & Order to the Court for filing. The Court

does not anticipate any disagreement on such a simple matter; if there is, areas of dispute shall be clearly marked with short descriptions of the basis for objection provided. The proposed agreed redacted Opinion & Order shall be e-mailed in Word format to Amy_Vogel@ohsd.uscourts.gov with all counsel and *pro se* parties copied within ten (10) days of this Opinion & Order. Failure to abide by this deadline will result in this Opinion & Order being filed unsealed.

**IT IS SO ORDERED**.


s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT COURT**