## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**ABINGTON EMERSON CAPITAL, LLC,**

    Plaintiff,

  vs.

**JASON ADKINS, *et al*.,**

    Defendants.

Case No.:  2:17-cv-00143

Judge Sarah D. Morrison

Magistrate Judge Kimberly Jolson

### OPINION & ORDER

This matter is before the Court pursuant to multiple motions *in limine* and a motion for bifurcation. Many of these motions could have been resolved without Court intervention had counsel simply communicated with each other.  The Court and the parties are about to ask a jury to spend a month of its time on this matter; trial will go more smoothly and efficiently if counsel act cooperatively and professionally.

## I. STANDARD OF REVIEW

A motion *in limine* is a pre-trial mechanism by which the Court can give the parties advance notice of the evidence upon which they may or may not rely to prove their theories of the case at trial. Although the Federal Rules of Evidence do not explicitly authorize a court to rule on an evidentiary motion *in limine*, the United States Supreme Court has noted that the practice of ruling on such motions "has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). The motions therefore

1

serve "to narrow the issues remaining for trial and to minimize disruptions at trial." *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999).

To obtain the *in limine* exclusion of evidence, a party must prove that the evidence is clearly inadmissible on all potential grounds. *Luce,* 469 U.S. at 41 n.4. Any motion *in limine* ruling, however, is "no more than a preliminary, or advisory, opinion that falls entirely within the discretion of the district court, and the district court may change its ruling where sufficient facts have developed that warrant the change." *United States v. Yannott*, 42 F.3d 999, 1007 (6th Cir. 1994). The Court will therefore entertain objections on individual proffers of evidence as they arise at trial, even though the proffered evidence falls within the scope of a denied motion *in limine. United States v. Kistner*, No. 2:11-cr-00283, 2013 U.S. Dist. LEXIS 2129, at *4-5 (S.D. Ohio Jan. 7, 2013) (Frost, J.).

## II. ABINGTON'S MOTIONS *IN LIMINE*

### A. ECF No. 396: Motion *in Limine* No. 1 to Exclude Treble Damages

Abington asks the Court to preclude reference to the treble damage provisions of 18 U.S.C. § 1964(c) and Ohio Rev. Code § 2923.34(E) at the jury trial as irrelevant and unduly prejudicial under Fed. R. Evid. 401-403. XPO responds that it does not intend to introduce treble damage evidence or argument as to the federal RICO count, but that it must do so as to the state RICO claim. (ECF No. 423.) XPO is correct.

> Unlike RICO's treble damages provision, which permits an award of treble damages when a claim is demonstrated by a simple "preponderance of the evidence," Ohio's Corrupt Activities Act sets forth a two-tier standard of

2

> proof. Upon a showing of a violation by a "preponderance of the evidence," a plaintiff is entitled to equitable and injunctive relief under R.C. 2923.34(C). Treble damages will be awarded only upon a showing of a violation by "clear and convincing evidence." R.C. 2923.34(F).[1] Because of this two-tier standard of proof, we find the trial court did not abuse its discretion in providing the jury with the treble damages instruction noted above.

*Schweisberger v. Weiner*, 5th Dist. Stark Nos. 1994 CA 00291, 1995 CA 00367, 1995 Ohio App. LEXIS 6101, *26-27 (Dec. 12, 1995); *see also CSAHA/UHHS-Canton, Inc. v. Aultman Health Found.*, 5th Dist. Stark No. 2010CA303, 2012-Ohio-897, ¶ 99 (holding "[t]reble damages will be awarded only upon a showing of a violation by clear and convincing evidence.").

Accordingly, Abington's motion is to exclude treble damages is **DENIED**. (ECF No. 396.)

### B. ECF No. 397: Motion *in Limine* No. 2 to Exclude Baltagi Investigation

Abington asks the Court to preclude "any argument or evidence at trial that [XPO] conducted an investigation into Baltagi's conduct or the operations of the Houston facility." (ECF No. 397, PageID 30749.) Abington argues such evidence should be excluded because XPO did not produce it during discovery.

XPO concedes the documents were not produced and that it blocked the testimony. It states that it will not be offering the testimony of Susan Santo, XPO's former in-house counsel, or of its then-Executive team regarding the scope and result of XPO's investigation. (ECF No. 424.)  Consequently, Abington's Motion to

---

[1] R.C. 2923.34(E) is the current version of, and identical to, R.C. 2923.34(F).

Exclude privileged testimony and evidence about XPO's investigation into Baltagi and Houston is **DENIED** as **MOOT**. (ECF No. 397.)

### C. ECF No. 398: Motion *in Limine* No. 3 to Limit Preemptory Challenges

Abington named XPO Logistics, Inc. and XPO Global Forwarding, Inc. as Defendants. Abington asks the Court to limit those defendants to a total of three preemptory challenges. Abington further requests the Court prevent them from duplicative arguments.

XPO replies that it will not seek more than three peremptory challenges and that it will not make duplicative arguments. (ECF No. 425.) As a result, Abington's motion to limit peremptory challenges and prohibit duplicative case presentation is **DENIED** as **MOOT**. (ECF No. 398.)

### D. ECF No. 399: Motion *in Limine* No. 4 to Preclude Live Witnesses

Abington seeks an order precluding XPO from calling witnesses in its case-in-chief unless XPO makes those witnesses available for Abington's presentation. (ECF No. 399.) XPO indicates that it is willing to work with Abington regarding the presentation of live witnesses and represents that Abington has refused to discuss the issue. (ECF No. 425.) This Motion is **DENIED** as **MOOT**. (ECF No. 399.)

### E. ECF No. 400: Motion *in Limine* No. 5 to Preclude Lack of Criminal Charges

Abington next argues that XPO should be precluded from introducing evidence or testimony informing the jury that the Government has not instigated criminal charges against XPO for XPO's alleged conduct in this matter because such

evidence is irrelevant, unduly prejudicial, and hearsay under Fed. R. Evi. 401-403 and 801. (ECF No. 400.) XPO opposes exclusion, noting that Abington does not explain how the evidence is irrelevant or unduly prejudicial and fails to sustain a finding that the evidence would equate to hearsay. (ECF No. 426.)

The Government investigation and prosecution information could become relevant if, as XPO asserts, one or both parties introduce evidence at trial regarding Adkins' criminal prosecution. *Id.* at PageID 31985. Doing so would open the door to making the Government's treatment of XPO relevant. Additionally, XPO is correct that Abington does not argue why the evidence would be unduly prejudicial. The Court will not fill that void. And, the phrasing of questions about this topic will inform the Court as to whether hearsay concerns are present.

For these reasons, the Court **DENIES** the Motion. (ECF No. 400.)

### F. ECF No. 401: Motion *in Limine* No. 6 to Exclude and Sequester Witnesses

Utilizing Fed. R. Evid. 615, Abington wants witnesses excluded from the trial except when they are testifying and sequestered before their testimony is complete. (ECF No. 401.) XPO consents to each request as long as corporate representatives may be present for the duration of the trial. (ECF No. 425.) The Motion (ECF No. 401) is **GRANTED** with XPO's caveat. *See* Fed. R. Evid. 615(b).

### G. ECF No. 402: Motion *in Limine* No. 7 to Exclude Expert Ozgur Kan's Opinion

One of XPO's experts, Ozgar Kan, opines that Abington's due diligence did not satisfy industry standards. (ECF No. 427-1.) Abington seeks to exclude that

opinion under Fed. R. Evid. 702, arguing that Kan lacks the requisite knowledge and employs the wrong methodology to so conclude. (ECF No. 402.)

      **1.    Federal R. Evid. 702 states**:

Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The rule "imposes a special obligation upon a trial judge to ensure that scientific testimony is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 137 (1999) (citing *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993)). This basic gatekeeping obligation applies to all expert testimony. *Kumho Tire Co.*, 526 U.S. at 147. But the gatekeeper role

> is not intended to supplant the adversary system or the role of the jury; rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. The judge's role is simply to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value. *Wellman v. Norfolk and W. Ry. Co.*, 98 F. Supp. 2d 919, 923-24 (S.D. Ohio 2000) [Sargus, J.].

*Ohio Oil Gathering Corp. III v. Welding, Inc.*, No. 2:09-cv-782, 2010 U.S. Dist. LEXIS 136248, at *15-16 (S.D. Ohio Dec. 9, 2010) (Frost, J.). "[R]ejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (citation omitted). Accordingly, "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998) (citation omitted).

"[U]nder *Daubert* and its progeny, a party proffering expert testimony must show by a 'preponderance of proof' that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of relevant issues." *Decker v. GE Healthcare* Inc., 770 F.3d 378, 391 (6th Cir. 2014) (citations omitted). "[T]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). Exclusion is proper when "the subject of the testimony lies outside the witness' area of expertise." 4 Weinstein's Fed. Evid. § 702.06[1], at 702-52 (2000). "In other words, a party cannot qualify as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue." *CDA of Am. Inc. v. Midland Life Ins. Co.*, No. 01-CV-837, 2006 U.S. Dist. LEXIS 97327, at *8 (S.D. Ohio Mar. 27, 2006) (Marbley, J.) (citation omitted).

### 2.    Knowledge and Experience

Abington spends considerable time on what Kan has not done. Namely, Kan has not joined any professional associations, written any scholarly articles, or become a member in relevant trade organizations regarding purchase order financing, the type of loan at issue here. Nor has Kan taught any classes on the purchase order financing or engaged in a purchase order financing deal during his professional career. Abington therefore extrapolates that he "lacks the necessary qualifications to provide expert opinions on the necessary due diligence steps in the purchase order financing transaction at issue in this case." (ECF No. 402, PageID 30772.)

Kan earned a PhD in finance. (ECF No. 427-1.) His professional career began at QuantCast Capital, LLC where he was an Investment Strategy Research Coordinator and Risk Manager. While there, he "[d]eveloped investment strategy protocol for weekly profit-taking, stop-loss, exit, and re-entry points." *Id*. Next, he was an Assistant Professor of Finance at two different higher learning institutions where he taught finance courses at the undergraduate and graduate level. He then worked for Marshall and Stevens, where he performed valuations for asset acquisitions and assessed public equity market acquisitions. He also worked for the Law and Economics Consulting Group, where he structured and valued portfolios of collateralized debt obligations, before going to  Moody's Consulting Group for five years. At Moody's, he: "built internal credit risk tools for banks and other financial institutions of all sizes to assess the credit of their clients for origination,

8

underwriting, portfolio monitoring, portfolio management and workout purposes. [He] also trained the underwriting staff and portfolio management teams of clients about the use of the credit risk tools for the same purposes." *Id*. at PageID 32001. He left Moody's to work for GE Capital, Americas, as a Head of Credit Methodology function, a position he held for two years. In that capacity, he was a "company-wide credit methodologies subject matter expert for activities including development of internal credit models, training of underwriters and risk personnel, participation in origination and underwriting of . . . asset-based loans . . . ." *Id*. at PageID 32066. He also "[s]erved as member of daily deal calls team for structuring, quantifying, and pricing of risk in . . . asset-based loans . . ." *Id*. He has been qualified as an expert in both federal and state courts and was an expert in bankruptcy matters involving due diligence red flags in Ponzi scheme/fraud cases. *Id*. at PageID 32062-32063.

Presently, Kan serves as Managing Director of Berkley Research Group's Credit Risk analytics, Financial Services, and Securities Practices. In this capacity, he works on "credit analysis and assessments, credit ratings, credit modeling and validation, . . . underwriting due diligence . . . ." (ECF No. 427-1, PageID 32058.) He holds the Chartered Financial Analyst and Financial Risk Manager designations. (ECF No. 427-1.)

Kan's background establishes that he has extensive knowledge and experience in asset-based lending; purchase-order financing is a type of asset-based lending. (427-3, PageID 32156.) Accordingly, XPO has proven by a preponderance of the evidence that Kan has sufficient knowledge and is qualified to testify about due

diligence in the realm of purchase-order financing. Any arguments about Kan's "knowledge gaps" go to weight rather than admissibility. *Burke v. U-Haul Int'l, Inc.*, No. 3:03CV-32-H, 2006 U.S. Dist. LEXIS 78231, at *11 (W.D. Ky. Oct. 20, 2006).

### 3. Methodology

Having determined that Kan has the requisite knowledge and experience to testify, the Court turns to whether his underlying methodology renders his opinion reliable enough to warrant its presentation to the jury. In this regard, Abington notes that Kan based his conclusion on the "Four Cs" of credit: character, capacity, collateral, and covenants. (ECF No. 402, PageID 30773.) Abington then argues, without support, that the 4Cs are not used in purchase-order financing such that Kan's methodology is unreliable and his opinion must be struck. *Id*. at PageID 30773-30776.

In so contending, Abington ignores Kan's conclusion that specialty financiers like Abington use the 4Cs and that Abington's own employees used three of the four "Cs" when underwriting the Landash deal. (ECF No. 427, PageID 31996) (citing Urtel Dep.). As such, the Court holds that Kan's testimony is the product of reliable principles and methods and he has reliably applied those principles and methods to the facts of the case.

Abington's Motion to Exclude Kan's Testimony (ECF No. 402) is **DENIED**.

### H. ECF No. 403: Motion *in Limine* No. 8 to Exclude Expert Tom Stephenson's Opinion

Tom Stephenson is XPO's OTR tire valuation expert. Relevantly, he opines as to: (1) the value of the tires in 2015; (2) whether sales documentation should have

put Abington on alert for fraud; (3) Adkins' untrustworthy reputation; and (4) shipping arrangement for the deal. Arguing that Stephenson lacks the requisite knowledge and employs the wrong methodology to so conclude, Abington seeks exclusion of those opinions under Rule 702. (ECF No. 403.) Having previously summarized the Rule 702 standard, the Court turns first to Abington's attack on Stephenson's knowledge before addressing its reliability arguments.

### 1. Knowledge and Experience

Stephenson's career in the OTR industry began in 1984. (ECF No. 428-1, PageID 32190.) He started as a service technician at a tire dealer and repair shop at Frank Allen Tyre Service. *Id*. Five years later, he became a Major Account Manager at Firestone in New Zealand. *Id*. In that role, he worked with large fleets requiring OTR tires. *Id*. In 1996, he purchased his own Firestone dealership supplying and servicing mining clients. *Id*. He became Chairman of the Firestone Tyre and Rubber Company of New Zealand National Dealer Council and won two Dealer of the Year awards. *Id*.

He sold his dealership and started Tyre Innovations, Ltd. in 2006. *Id*. Tyre Innovations "provides [p]rocurement services for hard to source tyres, . . . tyre inspection and evaluation services . . . " and still operates today. *Id*. Tyre innovations consuls with and manages an OTR port, and also "facilitates and over sees all import transactions [another client makes] through [Stephenson's] international network." *Id*. at 32190-32191.

In 2014, he began working for Carters Tyer [sic] Service as a National Sales Manager for Goodyear OTR Tyres, a position he still has. *Id*. at 32190.

During his thirty five year career, he has participated in more than $250 million in sales of OTR tires. *Id*. at 32191. His position as a consultant enabled him to have access to OTR tire costs on both the primary and gray market, the latter of which is at issue in this case. *Id*. He has worked with more than twenty major mining houses and has traveled throughout the world, including multiple trips to the United States. *Id*. Most trips were to inspect OTR tires that were being purchased. *Id*. He has served as a guest speaker at a OTR tire conference and at a mining institute. *Id*. He has obtained three certifications for servicing OTR tires.

Against this backdrop, Stephenson opines that the February 17, 2015 Work Order from Best One, the March 9, 2015 Letter of Intent, and March 16, 2015 Giant Tyre purchase order were "suspicious" because they lacked serial numbers and an inspection report for the OTR tires. *Id*. at PageID 32196. Abington argues this opinion must be struck because Stephenson admitted that he is not a document expert so he has insufficient knowledge for his opinion about whether those documents should have put Abington on alert for fraud. (ECF No. 403, PageID 30785) (citing ECF No. 356, PageID 26362-26363.)

XPO counters that it does not offer Stepheson in that role; rather, Stephenson is offered as an expert in the OTR tire industry in general and in OTR tire transactions specifically. From this, XPO asserts that Stephenson's "relevant opinion is that work orders typically include serial numbers and contain an

inspection report, and that the work orders he reviewed in this case are missing of what he typically expects to see on that type of document in a tire transaction." (ECF No. 428, PageID 32187.)

With that in mind, the Court concludes that Stepheson's vast and concentrated experience in the OTR Industry warrants him being designated as an expert here. Furthermore, his opinions relate to issues of valuation and fraud which are both at issue in this case. His specific knowledge will help the trier of fact to understand the evidence or to determine a fact in question. Stephenson is qualified to give expert testimony at trial on the topic of documentation and Abington's Motion to Exclude that testimony is **DENIED**. (ECF No. 403.)

### 2. Reliability

The next genesis for Abington's Motion is that Stephenson's highlighted opinions are not the product of reliable principles and methods. This Rule 702(b) argument equates to a reliability attack.

*Daubert* identifies several factors addressing a reliability determination, including whether the expert's sources and methods were subject to testing, peer review, publication, known or potential rate of error, and general acceptance. *Daubert*, 509 U.S. at 593-94. "The *Daubert* factors are neither definitive nor exhaustive and may not apply in every case." *European Pensions Mgmt. v. Columbus Life Ins. Co.*, No. 1:16-cv-542, 2017 U.S. Dist. LEXIS 167671, at *12-13 (S.D. Ohio Oct. 11, 2017) (Dlott, J.) (citing *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2006)). "Red flags that caution against certifying an

expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012). The anecdotal evidence flag is the source of Abington's contention that exclusion is warranted.

### a. Value of OTR Tires

Stephenson opines that the Landash deal's OTR tires were worth between $16,000 - $35,000 at the time of the deal, instead of the $90,000 value Abington and Adkins assigned to them. (ECF No. 428-1, PageID 32194.) According to Abington, this opinion must be precluded from admission at trial because Stephenson's experience has been only on the OTR domestic tire market in New Zealand since December 2014, several months before the Abington deal transpired. (ECF No. 403, PageID 30782.)

Stephenson's deposition testimony reveals otherwise.

> Q. What year was that that you started working only in New Zealand?
>
> [***]
>
> A. I started working back in New Zealand full-time in December of 2014.
>
> Q. After December 14th, were you involved in the selling or buying of tires in the OTR market in the United States?
>
> A. Yes, I was.
>
> Q. In what capacity?

> A. I was purchasing tires from the United States and bringing them into New Zealand and moving them into Australia. I also –
>
> Q. So when you say -- a couple minutes ago when you said something along the lines of when you stopped doing internationally, what did you mean by that?
>
> A. I stopped traveling internationally.
>
> Q. Just the traveling part?
>
> A. Yeah, correct. So instead -- yes, correct. So instead of hopping on a plane and going -- working in Saudi Arabia or working in U.S. or working in Mexico, I was doing everything remotely from home.

(Stephenson Dep. II at 28-29.)

Abington next argues that the documentation upon which Stephenson relied when reaching his value determination "is worthless" because the documents "refer[] to sales prices after" the deal occurred, "deal[] with different types and sizes" of OTR tires than those involved in the deal, and/or are good through 2012, three years before the deal. (ECF No. 403, PageID 30783.) Even if true, these are not grounds for exclusion. Stephenson's thirty five years of industry experience serve as adequate grounds for his valuation conclusion. And, mere "'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.'" *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993)). Abington's Motion to Exclude Stephenson's opinion as to the valuation of the tires is **DENIED**. (ECF No. 403.)

### b. Adkins' Reputation

Stephenson opines that Adkins had a reputation for being untrustworthy and fraudulent in the OTR tire industry around the time of the Landash deal. (ECF No. ECF No. 428-1, PageID 32196.) Abington initially attacks this conclusion's admissibility as unreliable for lack of foundation. (ECF No. 403, PageID 30780.)

According to Fed. R. Evid. 703

> [a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Furthermore, an expert's opinion may be based on "specialized" knowledge stemming from sufficient field experience like what is present here. Because sufficient foundation for the reputation opinion could be established at trial, the Court finds this ground for exclusion unpersuasive.

Abington also argues Stephenson's reputational opinion is unreliable and subject to exclusion because Stephenson himself, and his company, engaged in business transactions with Adkins after the Adkins deal. (ECF No. 403, PageID 30781.) This is a credibility issue reserved for the jury. Exclusion is therefore improper on this topic, and Abington's Motion to Exclude Stephenson's opinion about Adkins' reputation in 2015 is **DENIED**. (ECF No. 403.)

### c. Shipping

Lastly, Stephenson concludes that Abington should have been suspicious of the fraudulent nature of the Adkins deal by the expedited nature of the transaction and the circuitous shipping route it involved—that is, from California to Texas to Australia. (ECF No. 428-1, PageID 32197.) Abington seeks an order excluding this opinion based on Stephenson's deposition testimony. (ECF No. 403, PageID 30786-30787.)

Abington first contends this aspect of Stephenson's report is unreliable because Stephenson, himself, previously shipped skidder tires used in logging machinery from Houston to New Zealand, even though California is closer to New Zealand. (ECF No. 403, PageID 30786; ECF No. 356, PageID 236366.)

Abington also points to Stephenson's testimony indicating that he was not retained to opine on shipping matters and then to his subsequent testimony stating that he did provide an opinion on shipping as evidence of a contradiction warranting a finding of unreliability. (ECF No. 403, PageID 30787.) Abington is mistaken. As XPO highlights,

> Stephenson's report makes it clear that, in his experience, if OTR tires needed to be shipped quickly, the route proposed by Adkins was at odds with industry practice. Stephenson was correct that he is not providing general opinions on "shipping" writ large. What he is opining on is the fact that Adkins' shipping proposal made no sense given how the OTR tire industry generally operates and Adkins' representation that the tires were needed urgently, and that that situation should have caused Abington to investigate further. Stephenson, who has 35 years of experience in the OTR business, is qualified to offer this opinion.

(ECF No. 428, PageID 32186.)

Inconsistencies are the bases of cross-examination, not exclusion. These reasons for preclusion fail, and Abington's Motion to Exclude Stepheson's shipping opinion is **DENIED**. (ECF No. 403.)

In sum, Abington's Motion to Exclude Stephenson's noted opinions is **DENIED**. (ECF No. 403.)

## III.   XPO'S MOTIONS IN LIMINE

### A.  ECF No. 413: Motion *in Limine* No. 1 to Exclude Star Funding

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. However, relevant evidence becomes excludable "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

As set forth in the Court's January 22, 2021 Opinion and Order:

> Star Funding was a client of XPO. Star Funding engaged in a similar deal with Adkins a year after Abington's Landash deal failed. Adkins also failed to repay Star Funding's loan. Star Funding's twelve OTR tires were also stored at XPO's Houston location according to documents Baltagi executed that were identical in all key respects to the Warehouse Documents in this case. In May 2016, eleven months after the Landash deal failed, Star Funding complained to XPO that Baltagi had released its tires to Adkins without its consent.[] Upon receiving the complaint, XPO did not respond that Baltagi lacked authority to authorize the storage of the tires or to execute documents about the tires' location and condition.

18

> XPO did not audit [] Houston's tire inventory. Rather, one month after receiving the complaint, Baltagi resigned as branch manager. (ECF Nos. 316-3, 316-12.) In July 2016 he became an independent contractor for XPO. *Id*.

(ECF No. 384, PageID 30605-30606.) XPO asks the Court to preclude evidence and testimony regarding the May 2016 Star Funding deal on grounds of relevance or juror confusion. (ECF No. 413.) Specifically, XPO contends that Star Funding evidence is irrelevant to vicarious liability.

Abington disagrees, as does the Court. That evidence is relevant for at least two reasons. First, a question for the jury is whether Baltagi had actual authority to engage in the actions he did during the Abington deal; because Baltagi allegedly engaged in similar activity in Star Funding, his conduct in Star Funding is relevant. Second, as Abington points out, because XPO ratified Baltagi's paperwork in the Star Funding deal that mirrored documents he executed in the Landash deal, and because XPO confirmed the tires' presence in Houston for both deals, the Star Funding evidence tends to make XPO's ratification of Baltagi's actions in the Abington deal more likely.

Abington asserts other grounds supporting the relevance of the Star Funding Transaction. Because XPO moves only to exclude Star Funding evidence on the noted topics, the Court need not address Abington's alternative relevance arguments.

In sum, XPO's Motion to Exclude Star Funding Evidence is **DENIED**. (ECF No. 413.)

### B. ECF No. 414: Motion *in Limine* No. 2 to Exclude Brad Jacobs

Brad Jacobs is Chairman and CEO of XPO Logistics, Inc. The Court

permitted him to be deposed in a related matter, *Great Southland Limited v.*

*Landash Corporation, et al.*, 17cv-719, on the limited topic of an e-mail chain he was

copied on in May 2020 regarding Star Funding's request for an update on the status

of its tires.[2] (*Great Southland*, Case No. 17cv-719, ECF No. 192.) He testified that

he "did not recall" seeing or reading the e-mails. (ECF No. 414-3, PageID 31856,

31861.) He testified that he did not know if his assistant forwarded the e-mails to

him. *Id.* He said he did not remember asking anyone about the e-mails. *Id.* at

PageID 31860. In sum, he testified that he had "no recollection of any discussion

with anyone about this subject." *Id.* at PageID 31862.

XPO wants an order precluding Jacobs from testifying at trial and preventing

his deposition from being read at trial because Jacobs knows nothing about Star

Funding or this matter. (ECF No. 414, PageID 31803.) Consequently, XPO asserts

that Jacobs will be unable to "provide information to assist the factfinder in

deciding whether XPO had knowledge of any particular facts." *Id.*

Abington feels Jacobs' testimony, whether live or read, is relevant to show a

"potential cover-up" by XPO. It is not. Because Jacobs testified he lacked knowledge

about the Star Funding deal, he has no information that has any tendency to make

---

[2] XPO concedes that the e-mail string began in April 2015 but notes that an incorrect e-mail address was used for Jacobs until May 2020. (ECF No. 414, PageID 31799.)

a cover-up more or less probable than it would be without the evidence. Fed. R. Evid. 401.

Jacobs lacks relevant knowledge. Any testimony from him would therefore be inadmissible. Fed. R. Evid. 402. XPO's Motion to Preclude Abington from calling him as a witness or introducing his deposition testimony is **GRANTED**. (ECF No. 414.)

## C. ECF No. 415: Motion *in Limine* No. 3 to Exclude Legal Fees

XPO hired and paid for an attorney to represent Baltagi as to an October 2017 subpoena issued in this matter, before Abington filed its Second Amended Complaint in this case in February 2018 detailing the alleged role of Baltagi and naming him and XPO as defendants for the first time. After the Second Amended Complaint was filed, XPO stopped paying Baltagi's legal fees (which totaled $6,000 for the four-month period between October 2017 and February 2018). Less than two months after the Second Amended Complaint's filing, XPO terminated Baltagi's independent contractor status.

XPO contends evidence of the attorney fee's paid for Baltagi is irrelevant because such information "does not make it more or less probable that Abington justifiably relied on Baltagi's 2015 misrepresentations or that XPO should be held vicariously liable for Baltagi's 2015 actions." (ECF No. 415, PageID 31875.) Abington counters that such evidence is relevant to show XPO's acknowledgement of its "culpability for Baltagi's conduct" in the realm of vicarious liability. (ECF No. 431, PageID 32289.)

Courts interpret relevancy under Rule 401 "generously." *Polypropylene Hernia Mesh Prods. Liab. Litig. v. Bard* (*In re Davol, Inc.*), No. 2:18-cv-01509, 2021 U.S. Dist. LEXIS 25442, at *26 (S.D. Ohio Feb. 10, 2021) (Sargus, J.).

> The 'relevance threshold' is 'very low,' *United States v. Sumlin*, 956 F.3d 879, 889 (6th Cir. 2020) (quoting *United States v. Whittington*, 455 F.3d 736, 739 (6th Cir. 2006)), and 'extremely permissive,' *United States v. Pritchard*, 964 F.3d 513, 526 (6th Cir. 2020) (quoting *Wood v. Wal-Mart Stores, E., LP*, 576 F. App'x 470, 472 (6th Cir. 2014)). Evidence must simply have 'the slightest probative worth.' *United States v. Inzuna-Arenas*, --- F. App'x ----, No. 19-3830, 831 Fed. Appx. 778, 2020 U.S. App. LEXIS 36658, 2020 WL 6821688, at *3 (6th Cir. Nov. 20, 2020) (quoting *Whittington*, 455 F.3d at 738-39)).

*Id.* Because whether XPO is vicariously liable for Baltagi's actions is of consequence in this case, and because the attorney fee evidence has *any* tendency to make XPO's liability more or less probable than it would be without the evidence, the attorney fee evidence is relevant.

XPO then relies on Evidence Rule 403 to support exclusion. Specifically, it argues that the attorney fee evidence is unduly prejudicial because it "could falsely imply that XPO was sanctioning his conduct or protecting Baltagi" and because it could group XPO with Baltagi, a "bad actor." (ECF No. 415, PageID 31876.) "'Unfair prejudice,' as used in Rule 403, . . . refers to evidence which tends to suggest decision on an improper basis." *United States v. Sherrill*, 972 F.3d 752, 765 (6th Cir. 2020) (citation omitted). In other words:

> Rule 403 does not exclude evidence because it is strongly persuasive or compellingly relevant -- the rule only applies when it is likely that the jury will be moved by a piece of evidence in a manner that is somehow unfair or

> inappropriate. The truth may hurt, but Rule 403 does not
> make it inadmissible on that account.

*Polec v. Nw. Airlines* (*In re Air Crash Disaster*), 86 F.3d 498, 538 (6th Cir. 1996).

Here, that XPO paid certain of Baltagi's attorney's fees may be unflattering, but is not unduly prejudicial. XPO is free to introduce evidence showing its alleged ignorance of Baltagi's actions until after the Second Amended Complaint was filed in this matter. No undue prejudice is present.

XPO's last argument is based on judicial economy. (ECF No. 415, PageID 31877.) That is, XPO states it produced the attorney's fee information "under reservation of rights and to resolve many discovery disputes . . . ." (ECF No. 415, PageID 31877.) As such, XPO argues, permitting the use of the information "would serve to stifle informal resolution of discovery disputes and incentivize motions practice as a means to create bargaining chips." *Id.* Abington responds that following that logic would make any information produced to an opposing party inadmissible at trial. (ECF No. 431, PageID 32291.)

Absent privilege or malfeasance, the reason for production of evidence plays no role in the Court's later determination of relevance and admissibility of that evidence. Evidence is relevant or it is not. Evidence is admissible or it is not. Here, the attorney's fees information is relevant and not unduly prejudicial. Its admission at trial is not barred based upon the arguments presently made. XPO's Motion to Exclude Evidence Regarding Legal Fees is **DENIED**. (ECF No. 415.)

**D. ECF No. 416: Motion *in Limine* No. 4 to Preclude Usuary Interest**

As of April 2021, Abington estimated its compensatory damages to be

$9,695,956.66, which includes interest under the Landash deal at a rate of 78%.

(ECF No. 416-2.) Abington seeks $29,087,869.98 (including the calculation of

compensatory damages) in treble damages under federal and state RICO statutes.

(ECF No. 408, PageID 30801.) Abington also seeks $335,161.48 in pre-judgment

interest at the statutory rate of 3%. *Id.*

XPO asks for an order "precluding Abington from seeking as damages in this

matter from XPO the usuary and inflated Ponzi-scheme rate of return promised by

wrongdoer Jason Adkins in the agreement between Adkins and Abington." (ECF

No. 416, PageID 31879.) Abington counters that it is entitled to such damages from

XPO by virtue of Abington's fraud and RICO counts against XPO. (ECF No. 432.)

Ohio courts typically adhere to "the principles set forth in the Restatement

(Second) of Torts when discerning the propriety and amount of damages in fraud

cases." *Auto Chem Labs., Inc. v. Turtle Wax, Inc.*, No. 3:07cv156, 2010 U.S. Dist.

LEXIS 100677, at *21-23 (S.D. Ohio Sep. 24, 2010) (Rice, J.) (citing cases).

Restatement (Second) of Torts, § 549 (1977), entitled Measure of Damages for

Fraudulent Misrepresentation, provides:

> (1) The recipient of a fraudulent misrepresentation is
> entitled to recover as damages in an action of deceit
> against the maker the pecuniary loss to him of which the
> misrepresentation is a legal cause, including
>
>> (a) the difference between the value of what he has
>> received in the transaction and its purchase price
>> or other value given for it; and

> > (b) pecuniary loss suffered otherwise as a
> > consequence of the recipient's reliance upon the
> > misrepresentation.
>
> > (2) The recipient of a fraudulent misrepresentation in a
> > business transaction is also entitled to recover additional
> > damages sufficient to give him the benefit of his contract
> > with the maker, if these damages are proved with
> > reasonable certainty.

"Damages awarded under paragraph (1) are referred to as 'out-of-pocket' damages,

while those awarded under paragraph (2) are 'benefit-of-the-bargain' damages. *Auto

Chem Labs.,* 2010 U.S. Dist. LEXIS 100677, at *21-23 (citation omitted.)

There is no contract between Abington and XPO, so Abington's potential

damages against XPO for fraud are limited to out-of-pocket damages. "Should the

Plaintiffs later prove that the Defendant is liable to them for fraud, but not based

on a valid contract, however, they are only entitled to the pecuniary loss of which

the fraudulent conduct was a legal cause or, in other words, to be compensated for

the loss they sustained and to be restored to their former position." *Id.* at *27 (S.D.

Ohio Sep. 24, 2010) (citations omitted.) Thus, benefit-of-the-bargain damages, which

include the Landash deal's interest rate, are not available to Abington for its fraud

claims against XPO. XPO's Motion to Limit Abington from Seeking Usury Interest

from XPO on the fraud count is **GRANTED**. (ECF No. 416.)

That leaves Abington's federal RICO claims against XPO.[3] "Under 18 U.S.C.

§ 1964(c), prevailing plaintiffs are entitled to treble damages and costs of the RICO

---

[3] Abington does not discuss its state RICO claims. (ECF No. 432, PageID
32297.)

suit, including reasonable attorney fees." *Brown v. Cassens Transp. Co.*, 675 F.3d 946, 966 (6th Cir. 2012), *overruled on other grounds by Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556 (6th Cir. 2013). The Court holds above that Abington cannot collect contractual interest from XPO on Abington's fraud count. Similarly, the base amount of potential RICO treble damages cannot contain contractual interest.

Having rejected the lone basis for imposition of the interest rate in the Adkins contract against XPO for the RICO count, the Court **GRANTS** XPO's Motion to Limit Abington from Seeking Usury Interest from XPO on that count. (ECF No. 416.)

### E. ECF No. 417: Motion *in Limine* No. 5 to Preclude Other Investors

XPO wants an order precluding evidence and testimony as to other individuals Adkins scammed from being introduced at trial. (ECF No. 417.) XPO argues Abington's failure to timely and specifically identify Rob Schroder, Casey Dunfee, Nick Lather, Amy Newlove, Jamie Edwards, Jan Shory, and Bruce Hann ("Smaller Investors") as witnesses precludes Abington from calling them as witnesses and introducing related exhibits at trial. *Id.* at PageID 31925. Abington asserts it timely and properly named the Smaller Investors. *Id.*

Turning first to the failure to identify issue, Abington argues its January 2019 Supplemental Initial Disclosures sufficiently identified the Smaller Investors by referring to "all persons or entities identified as creditors or parties in interest in" the Adkins and Landash Bankruptcies. (ECF No. 433, PageID 32307.) XPO disagrees, contending that generic identification of "hundreds of litigants" is

26

insufficient under Fed. R. Civ. P. 26's duty to supplement and therefore subject to exclusion under Fed. R. Civ. P. 37. (ECF No. 417, PageID 31925, n.4.)

"The question before the Court is whether the Defendants supplemented their discovery responses [with the specific names of the Smaller Investors] in a 'timely manner' under Rule 26(e)(1)(A) and, if they did not, whether that failure was 'substantially justified' or 'harmless' under Rule 37(c)(1)." *Thomas v. McDowell*, No. 2:10-cv-152, 2014 U.S. Dist. LEXIS 146914, at *6 (S.D. Ohio Oct. 15, 2014) (Graham, J.). Abington has the burden of establishing timeliness as well as either substantial justification or harmlessness. *See Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003).

Abington first provided its generic disclosure in January 2019. Abington did not reveal its intention to call the Smaller Investors until August 2021, long after the October 2019 discovery cut-off. (ECF Nos. 230, 408.) Abington's specification was certainly untimely.

Abington only argues that its untimely disclosure was harmless. "[A] failure to supplement is 'harmless' where that failure 'involves an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party.'" *Thomas*, 2014 U.S. Dist. LEXIS 146914, at *4 (quoting *Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003) (citation omitted)). Abington does not indicate it made an honest mistake; rather, Abington contends XPO should have known Abington would call the Smaller Investors because "XPO was a party to the Landash and Adkins bankruptcies, and it was represented by the same law firm representing XPO in

this litigation." (ECF no. 433, PageID 32307.) But those facts do not excuse Abington's duty to timely supplement its witness disclosure in this case, especially where, as here, its initial disclosure covered hundreds of creditors and other litigants.

Abington failed to establish its burden. The Smaller Investors will not be permitted to testify and any related exhibits will not presented to the jury. XPO's Motion to Exclude Evidence Related to Adkins['] Other Ponzi Scheme Investors is **GRANTED**. (ECF No. 417.)

### F. ECF No. 418: Motion *in Limine* No. 6 to Preclude Reference to Settlement

For this motion, XPO seeks an order precluding Abington from "referencing XPO's settlement of, or attempts to settle, any other litigation related to the Adkins Ponzi scheme" as irrelevant under Rule 401, unduly prejudicial or confusing under Rule 403, and/or precluded under Fed. R. Evi. 408. (ECF No. 418, PageID 31939.) While agreeing that settlement discussions between Abington and XPO are properly excludable, Abington argues that XPO's attempts to resolve other related matters is admissible

> to rebut XPO's argument that XPO Global Forwarding, Inc. is the only proper party in this case as XPO Logistics, Inc. the parent was almost certainly part of any settlement agreement and almost certainly paid any settlement proceeds. XPO Logistics Inc.'s control and funding of the settlement is therefore relevant – and admissible – to establish the relationship between the parties and the identity of the properly responsible entity.

(ECF No. 434, PageID 33359.)

Assuming, arguendo, that evidence of settlement in related cases is relevant here, the Court finds that its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury. XPO's Motion in Limine to Preclude Abington from Referencing Settlement is **GRANTED**. (ECF No. 418.).

## IV.    XPO'S MOTION TO BIFURCATE

Lastly, XPO seeks an order pursuant to Fed. R. Civ. P. 42(b), Rule 401, and Rule 403 bifurcating the trial into an initial liability and compensatory damage phase and a separate punitive damages phase only if liability is established during the initial phase. (ECF No. 420.) XPO argues bifurcation is necessary to: (1) prevent jury confusion via the presentation of irrelevant evidence, as the question of which entity is responsible for Baltagi's actions is for the jury to decide; (2) avoid prejudice, as evidence regarding the "substantial net worth" of both Defendant XPO entities could cause the jury to assume the companies' net worth alone justifies compensating Abington for its claimed damages; and (3) expedite and economize trial presentation, because if only one Defendant XPO entity is found liable, evidence as to the other's net worth is irrelevant and unnecessarily time consuming.

Abington contends bifurcation based upon the financial condition of the XPO Defendants is against "the interest of judicial economy" (ECF No. 437, PageID 33598) because such evidence is relevant to establish one of the reasons why Abington decided to move forward with the Landash deal. Specifically, Abington argues "[t]he fact that XPO is a publicly traded company and one of the largest providers of transportation logistics services on the continent instilled confidence in

Abington to move forward with the transaction." Abington offers that any potential confusion could be mooted by a limiting jury instruction.

> Rule 42(b) provides:

>> Separate Trials. For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims. When ordering a separate trial, the court must preserve any federal right to a jury trial.

XPO, as the party seeking bifurcation, "has the burden of showing that concerns such as judicial economy and prejudice weigh in favor of granting the motion[,]" *Woods v. State Farm Fire & Cas. Co.*, No. 2:09-cv-482, 2010 U.S. Dist. LEXIS 35230, 2010 WL 1032018, at *1 (S.D. Ohio Mar. 16, 2010) (citing Wright & Miller, Federal Practice and Procedure § 2388 (2d ed. 2006)), "but only one of the bifurcation criteria from Rule 42 must be met in order to satisfy that burden." *Ohio Value Physicians, Inc. v. Scottsdale Surplus Lines Ins. Co.*, No. 1:20-cv-453, 2021 U.S. Dist. LEXIS 37134, at *5 (S.D. Ohio Mar. 1, 2021) (Litkovitz, M.J.) (citation omitted). The Court has broad discretion when addressing bifurcation motions. *See Saxion v. Titan-C-Manufacturing*, 86 F.3d 553, 556 (6th Cir. 1996) (district courts have discretion); *see also Wilson v. Morgan*, 477 F.3d 326, 339 (6th Cir. 2007) (decision to bifurcate reviewed for abuse of discretion).

XPO proves both criteria. Because only one XPO entity can be held liable here, the presentation of financial evidence as to the other becomes irrelevant. Bifurcation therefore serves judicial economy in that extraneous and irrelevant evidence is not presented to the jury, therefore shortening trial time and also

eliminating juror confusion. Additionally, permitting the information's admission would yield undue prejudice to XPO. The Court finds significant weight in XPO's position that the "substantial net worth" of both Defendant XPO entities could cause the jury to assume the companies' net worth alone justifies compensating Abington for its claimed injuries. As such, given the specific circumstances presented here, XPO's Motion to Bifurcate Trial Regarding Punitive Damages is **GRANTED**. (ECF No. 420.) If the jury determines one XPO Defendant is liable, then the presentation of evidence as to punitive damages shall immediately begin before the same jury.

## V.    CONCLUSION

Abington's Motion *in Limine* to Exclude Treble Damages is **DENIED**. (ECF No. 396.)

Abington's Motion *in Limine* No. 2 to Exclude Baltagi Investigation is **DENIED** as **MOOT**.  (ECF No. 397.)

Abington's Motion *in Limine* No. 3 to Limit Preemptory Challenges is **DENIED** as **MOOT**. (ECF No. 398.)

Abington's Motion *in Limine* No. 4 to Preclude Live Witnesses is **DENIED** as **MOOT**. (ECF No. 399.)

Abington's Motion *in Limine* No. 5 to Preclude Lack of  Criminal Charges is **DENIED**. (ECF No. 400.)

Abington's Motion *in Limine* No. 6 to Exclude and Sequester Witnesses is **GRANTED,** with corporate representatives being present for the duration of the trial. (ECF No. 401.)

Abington's Motion *in Limine* No. 7 to Exclude Expert Ozgur Kan's Opinion is **DENIED.** (ECF No. 402.)

Abington's Motion *in Limine* No. 8 to Exclude Expert Tom Stephenson's Opinion is fully **DENIED**. (ECF No. 403.)

XPO's Motion *in Limine* No. 1 to Exclude Star Funding is **DENIED**. (ECF No. 413.)

XPO's Motion *in Limine* No. 2 to Exclude Brad Jacobs is **GRANTED**. (ECF No. 414.)

XPO's Motion *in Limine* No. 3 to Exclude Legal Fees is **DENIED**. (ECF No. 415.)

XPO's Motion *in Limine* No. 4 to Preclude Usuary Interest is **GRANTED**. (ECF No. 416.)

XPO's Motion *in Limine* No. 5 to Preclude Other Investors is **GRANTED** (ECF No. 417.)

XPO's Motion *in Limine* No. 6 to Preclude Reference to  Settlement is **GRANTED**. (ECF No. 418.)

XPO's Motion to Bifurcate is **GRANTED**. (ECF No. 420.)

Counsel shall be prepared to argue XPO's Motion *in Limine* No. 7 to Preclude Lisinski's Testimony (ECF No. 419) as well as XPO's Motion to Seal Document (ECF No. 446) at the final pre-trial conference.

**IT IS SO ORDERED**.

<u>s/Sarah D. Morrison</u>
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**